IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CESAR ARBELAEZ TABARES and
JUAN CARLOS BAZANTES,

Defendants.

CRIMINAL CASE NO.

1:15-CR-00277-SCJ-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendants Tabares' and Bazantes' motions [Docs. 27 and 29] to dismiss Counts 7 through 12 of the indictment charging Defendants with violation of 18 U.S.C. § 1001, that is, making a materially false statement within the jurisdiction of the federal government, and to dismiss Counts 2 through 6 of the indictment charging Defendants with violation of 26 U.S.C. § 7202, that is, defrauding the lawful functions of the Internal Revenue Service in the ascertainment, computation and collection of revenue. Also pending before the court are Defendants' motion [Doc. 28] to suppress evidence seized as the result of the execution of a federal search warrant,[1] motion [Doc. 31] for discovery concerning alleged selective prosecution, and

_____

[1]A limited evidentiary hearing was held on this motion to determine whether certain individual(s) were acting as governmental agents when obtaining certain evidence used in support of probable cause for the search warrant. [Doc. 67].

motion [Doc. 32] for a bill of particulars.  The Government responded [Docs. 39, 41, 42, 43, 45 and 57] opposing the motions.  After consideration of the arguments of the parties, evidence presented at the hearing on the motion to suppress and relevant legal authority, the court recommends that Defendants' motions be denied.

<u>**Motions to Dismiss Counts 2 Through 12 of the Indictment**</u>

Defendants seek to dismiss Counts 2 through 6 of the indictment [Doc. 29] and Counts 7 through 12 of the indictment [Doc. 27] - and to strike from the indictment all references to those charges and the facts underlying those charges - asserting that the indictment fails to allege offenses under the charged federal statutes, 26 U.S.C. § 7202 and 18 U.S.C. § 1001.  And, with respect to Counts 2 through 6, Defendants contend that the charges should be dismissed due to violation of their Fifth Amendment substantive and procedural due process rights.  [Doc. 30 at 24-33].  The Government opposes the  motions to dismiss.  [Docs. 39 and 41].

**I.     Background Facts**

On July 28, 2015, a federal grand jury returned a twelve count indictment against Defendants Tabares and Bazantes.  In Count One (which is not the subject of the motions to dismiss), Defendants are charged with a conspiracy, in violation of 18 U.S.C. § 371, "(a) to defraud the United States for the purpose of impeding, impairing,

2

obstructing, and defeating the lawful government functions of the Internal Revenue Service (IRS), . . . in the ascertainment, computation, assessment, and collection of revenue, specifically, employment taxes; and (b) to violate Title 18, United States Code, Section 1001(a)(3), by knowingly and willfully submitting false certified payroll forms to the Centers for Disease Control and Prevention [("CDC")], a federal agency . . . ." [Doc. 1, Count 1]. The indictment provides as background information that IWES Contractors, Inc. ("IWES") was in the business of supplying drywall laborers and subcontractors for construction projects and that Defendant Tabares was IWES Chief Executive Officer and Defendant Bazantes was IWES Secretary and Chief Financial Officer. [Id.]. The indictment avers that, under federal law, employers are required to file quarterly employment tax returns with the IRS ("Forms 941") which state the federal employment taxes withheld from employees' wages for that quarter. The indictment further avers that, under federal law, persons paid to perform work for a contractor or subcontractor on a federally funded construction project must receive wages and that the general contractor for the project is required weekly to submit a certified payroll form, signed under the penalty of perjury, to the federal agency funding the project; the form includes the identity of workers on the project, rates of pay/wages and federal payroll deductions from wages. [Id.].

3

The indictment then sets forth the manner and means by which Defendants sought to accomplish the alleged conspiracy.  In January 2012, IWES entered a contract with a subcontractor, M.E., on a CDC federally funded project for which IWES agreed to supply drywall laborers.  [Id.].  At the direction of Defendants, a spreadsheet was created for the laborers used on the CDC project classifying each worker as receiving either (1) one paycheck per pay period totaling net pay (gross wages minus employment taxes) and those workers received an IRS Form W-2 at year end and were reported on the quarterly employment tax returns IWES filed with the IRS or (2) two paychecks per pay period, one with net pay (gross wages minus employment taxes) and the second with the amount of withheld employment taxes (both checks constituting gross wages without any withholdings), and those workers were not reported on quarterly employment tax returns.  The indictment alleges that all workers on the CDC project should have been treated as employees and reported on IWES's quarterly employment tax returns.  [Id.].  Each week, IWES submitted certified payroll forms to M.E., which were transmitted by the general contractor to the CDC, for the CDC project and which falsely reported all workers as having employment tax deductions withheld from the wages paid, including those workers receiving two paychecks who did not in fact have any employment taxes withheld and

4

who were not reported on IWES's quarterly employment tax returns.  As a result, the indictment alleges that Defendants caused IWES to fail to report over $800,000 in wages to the IRS.  [Id.].

In furtherance of the conspiracy, as overt acts, the indictment alleges that Defendant Bazantes instructed IWES's accountant to calculate employment tax withholdings for all workers on the CDC project; however, only the workers receiving one paycheck were reported on Form 941 (the quarterly employment tax returns). These quarterly tax returns were signed by Defendant Tabares, falsely under-reporting the number of employees receiving compensation, for the second quarter of 2012 and for the third quarter of 2012.  [Id.].  And the indictment alleges that on March 25, 2012, and on January 27, 2013, Defendant Tabares signed certified payroll forms falsely representing that employment taxes had been deducted from the wages of certain workers on the CDC project.  [Id.].

In Counts 2 through 6, incorporating by reference the allegations in Count 1, the indictment alleges that for the first, second, third and fourth quarters of 2012 and the first quarter of 2013, Defendants, aided and abetted by one another and others unknown, willfully failed "to truthfully collect, account for and pay over to the IRS all of the federal income taxes and FICA taxes due and owing to the United States on

5

behalf of the IWES and its employees," in violation of 26 U.S.C. § 7202.  [Id.].  And Counts 7 through 12, again incorporating the allegations in Count 1, allege that Defendants, aided and abetted by one another and others unknown, for the weeks identified in the indictment, willfully and knowingly made and used false writings and documents to the CDC, that is, the certified payroll forms, "knowing the same to contain materially false, fictitious, and fraudulent statements and entries in a matter within the jurisdiction of the executive branch of the Government of the United States, by falsely representing on the certified payroll forms submitted to the CDC that employment taxes had been deducted from the wages of certain IWES workers who performed work on the CDC construction project," knowing such deductions had not been taken.  [Id.].

## II.    Discussion

With respect to Counts 2 through 6, alleging violations of 26 U.S.C. § 7202, Defendants spend many pages of the memorandum in support of the motion to dismiss discussing the Davis-Bacon Act involving payment of the prevailing wages under employment laws and giving an overview of employment tax, including discussing the law applicable to when a worker is an employee (not an independent contractor) requiring the withholding by the employer of federal employment taxes.  [Doc. 30 at

6

2-5, 7-15].  Discussing the factors, numbering up to twenty, used by the courts to make the determination whether an individual is an employee or independent contractor, Defendants argue that analysis of those factors in this case "overwhelmingly supported IWES's treatment of workers as independent contractors" [Id. at 13], that is, for purposes of the allegations in this indictment, the IWES workers who received two paychecks each pay period resulting in the workers receiving gross pay without any withholdings.  And Defendants cited to civil tax cases applying those factors, based on the evidence presented in each case, to determine whether employers had been properly assessed civil tax liability.  [Id. at 13-14].  In support of the arguments made to dismiss these counts for failure to allege an offense, Defendant's rely on facts not stated in the indictment and on a declaration, attached to the motion to dismiss, analyzing the records produced in discovery to argue, in essence, that Defendants are not guilty of the charged offenses in Counts 2 through 6.  [Id. at 18-19; Exhibit 1]. Contrary to Defendants' assertion, Counts 2 through 6 do not allege that Defendants failed "to collect and pay over amounts showing on a DOL form" [Doc. 30 at 24] but, as noted, that they willfully failed "to truthfully collect, account for and pay over to the IRS all of the federal income taxes and FICA taxes due and owing to the United States on behalf of the IWES and its employees," in violation of 26 U.S.C. § 7202 [Doc. 1].

7

With respect to Counts 7 through 12, Defendants apparently misconstrue the nature of the 18 U.S.C. § 1001 charges and argue about whether various DOL forms are required and what is required or not required to be reported on DOL forms and, again, discuss their understanding of the Davis-Bacon Act's requirements under labor law. Based on these arguments Defendants assert that the offenses alleged in the indictment do not - as a matter of law - establish two elements of a § 1001 charge, materiality and jurisdiction. [Doc. 27 at 2-8, 9-11]. Defendants also assert that the allegations in the indictment, instead, establish that the allegedly false statements in the certified payroll forms, that is, that federal payroll taxes were withheld for workers on the CDC project, were not a matter within the jurisdiction of the federal government because Defendants submitted the certified payroll forms to M.E., a private entity, not the CDC. [Id. at 13-17; Doc. 46].

The Eleventh Circuit Court of Appeals stated the law regarding attacks on the sufficiency of an indictment: "By now it has become well-established that '[t]he sufficiency of a criminal indictment is determined from its face.' . . . 'For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.' . . . 'An indictment not framed to apprise the defendant with reasonable certainty, of

8

the nature of the accusation against him is defective, although it may follow the language of the statute.'" <u>United States v. Sharpe</u>, 438 F.3d 1257, 1263 (11th Cir. 2006) (citations omitted).  In resolving a pretrial motion to dismiss, the court is not determining whether the Government's evidence is sufficient to find Defendants guilty of the charges in the indictment or whether the Government will carry its burden of proof at trial but only whether there is a legal infirmity or defect in the indictment.  <u>See Id.</u> ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes. . . .  It is well-settled that 'a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.'") (citations omitted; emphasis in original); <u>United States v. Plummer</u>, 221 F.3d 1298, 1302 n.3 (11th Cir. 2000) (noting that the district court in ruling on the motion to dismiss the indictment for failure to state an offense improperly considered facts not alleged in the indictment when focus should have been on indictment itself).

As stated by the district court in <u>United States v. Ferguson</u>, 142 F. Supp. 2d 1350 (S.D. Fla. 2000):

> In criminal proceedings, there is no summary judgment mechanism. . . .
> "Nor do the rules provide for a pre-trial determination of sufficiency of

9

the evidence." . . .  This, of course, is because the resolution of factual questions is the sole province of the jury. . . .

[T]he Court's review at this stage of the proceeding is very limited.  The Court may dismiss the case based upon: (1) a legal infirmity or defect in the charging instrument; or (2) a purely legal question, such as a determination that the statute is unconstitutional.  Any issues that require consideration of the facts underlying this prosecution, however, are not the proper subject of a pretrial motion to dismiss.

Id. at 1353-54 (citations omitted); see also United States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004) ("'There is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. . . .  The sufficiency of a criminal indictment is determined from its face.  The indictment is sufficient if it charges in the language of the statute.'") (quoting United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992)).

With respect to Counts 2 through 6, charging violations of 26 U.S.C. § 7202, the indictment sufficiently alleges, in the terms of the statute, the tax offense charged.  The indictment alleges that for the first, second, third and fourth quarters of 2012 and the first quarter of 2013, Defendants, aided and abetted by one another and others unknown, willfully failed "to truthfully collect, account for and pay over to the IRS all of the federal income taxes and FICA taxes due and owing to the United States on behalf of the IWES and its employees," in violation of 26 U.S.C. § 7202.  [Doc. 1].

10

Section 7202 "provides that '[a]ny person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall' be guilty of a felony." <u>United States v. Russell</u>, 2013 WL 572085, at *1 (D. Neb. February 13, 2013) (citation omitted). There are three essential elements in this statute: "(1) the defendant had a duty to collect, account for, or pay over the tax at issue; (2) the defendant knew of this duty; and (3) the defendant willfully failed to collect, account for, or pay over the tax." <u>Id.</u> (citations omitted). The language in these counts, especially when considered in light of the allegations of fact incorporated by reference from Count 1,[2] states the elements

---

[2]These facts include as follows. IWES was in the business of supplying drywall laborers and subcontractors for construction projects. Defendant Tabares was IWES Chief Executive Officer, and Defendant Bazantes was IWES Secretary and Chief Financial Officer. [Doc. 1, Count 1]. Under federal law, employers are required to file quarterly employment tax returns with the IRS which state the federal employment taxes withheld from employees' wages for that quarter. [<u>Id.</u>]. At the direction of Defendants, a spreadsheet was created for the laborers used on the CDC project classifying each worker as receiving either (1) one paycheck per pay period totaling net pay (gross wages minus employment taxes) and those workers received an IRS Form W-2 at year end and were reported on the quarterly employment tax returns IWES filed with the IRS or (2) two paychecks per pay period, one with net pay (gross wages minus employment taxes) and the second with the amount of withheld employment taxes (both checks constituting gross wages without any withholdings), and those workers were not reported on quarterly employment tax returns. However, all workers on the CDC project should have been treated as employees and reported on IWES's quarterly employment tax returns. [<u>Id.</u>]. Defendants caused IWES to fail to report over $800,000 in wages to the IRS. [<u>Id.</u>].

of the charged offense.  Id., at *2 ("[s]tating that taxes were 'due and owing' is functionally equivalent to stating the defendants had a duty to pay the taxes" and alleging willfulness in failing to pay "sufficiently allege[s] that defendants knew they had a duty to pay over the taxes").

The focus of Defendants' contention that Counts 2 through 6 should be dismissed is that the evidence - evaluated under a fact intensive evaluation of numerous factors - establishes that Defendants properly classified certain workers as independent contractors for which no federal employment taxes had to be withheld and reported on quarterly tax returns.  [Doc. 30 at 2-5, 7-13, 18-20, 23-24].  Defendants are asking the court to evaluate evidence and to consider, in doing so, facts not alleged in the indictment; they are not requesting the court to solely judge whether the indictment adequately charges the alleged offenses with the sufficiency of the evidence offered by the Government subsequently to be judged by the jury at trial.  See Salman, 378 F.3d at 1268 ("'The indictment is sufficient if it charges in the language of the statute.'") (citation omitted).  As noted, "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes. . . .  It is well-settled that 'a court may not dismiss an indictment . . . on a determination of facts that should

12

have been developed at trial.'" <u>Sharpe</u>, 438 F.3d at 1263 (citation omitted; emphasis in original).  The court declines, as it must, Defendants' invitation to act as a trier of fact in ruling on the motion to dismiss.

The court also finds that Counts 7 through 12 sufficiently state offenses pursuant to 18 U.S.C. § 1001 and that the indictment has not failed to allege the elements of materiality and jurisdiction as a matter of law.  Defendants are alleged to have violated § 1001(a)(3), for the weeks identified in the indictment, by willfully and knowingly making and using false writings and documents to the CDC, that is, the certified payroll forms, "knowing the same to contain materially false, fictitious, and fraudulent statements and entries in a matter within the jurisdiction of the executive branch of the Government of the United States, by falsely representing on the certified payroll forms submitted to the CDC that employment taxes had been deducted from the wages of certain IWES workers who performed work on the CDC construction project," knowing such deductions had not been taken. [Doc. 1].  A violation of § 1001 requires "'(1) that the defendant made a false statement; (2) that the statement was material; (3) that the defendant acted with specific intent to mislead; and (4) that the matter was within the purview of a federal government agency.'" <u>United States v. Rosario</u>, 520 Fed. Appx. 928, 929 (11th Cir. 2013) (citation omitted).  The language cited above

13

from the indictment alleges each of these elements. However, Defendants argue, by looking to the allegations of fact incorporated by reference from Count 1, that as a matter of law the indictment does not sufficiently plead materiality and jurisdiction of a federal agency with respect to the alleged false statement. [Doc. 29]. Defendants' arguments fail for the following reasons.

With respect to materiality, Defendants contend that the allegedly false statement on the DOL forms, that is, "falsely representing on the certified payroll forms submitted to the CDC that employment taxes had been deducted from the wages of certain IWES workers who performed work on the CDC construction project," knowing such deductions had not been taken [Doc. 1], is not required information on the certified payroll forms (which facilitate collection of information about workers' wages and benefits not federal withholding taxes) and simply is not material to the CDC's decisionmaking authority. [Doc. 27 at 8-12]. As Defendants state, "To be material, the statement 'must have a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed[;]' . . . however, '[t]he government is not required to prove that the statement had actual influence.'" Rosario, 520 Fed. Appx. at 929 (citations omitted). The primary difficulty in complying with Defendants' request for the court to evaluate the issue of

14

materiality, is the Supreme Court's holding that "[t]he question of materiality must be submitted to the jury." Id. (citing United States v. Gaudin, 115 S. Ct. 2310, 2320 (1995)); and see United States v. Khalil, 2014 WL 1599943, at *2 (E.D. N.Y. April 21, 2014) (finding that it was improper for a trial court to grant a motion "to dismiss the indictment on the grounds that defendant's alleged false statements were not material"); United States v. Peterson, 2008 WL 2323782, at *2 (M.D. Ga. June 2, 2008) (declining to entertain motion to dismiss count alleging violation of § 1001 on grounds of lack of materiality of the allegedly false statement because that determination is a question of fact for the jury).

In Khalil, the court explained that in order to dismiss the indictment before trial on a finding that materiality was insufficiently alleged, "the Court would need to determine (a) whether defendant made these statements (and whether they were false), (b) what decision the [federal agency] was trying to make at the time, and (c) whether defendant's statements were material to that decision[,]" thus, requiring the Court "to make several factual determinations, which would require it to access the sufficiency of the government's proof." 2014 WL 1599943, at *2; and see Rosario, 520 Fed. Appx. at 929 (noting that Supreme Court outlined the same facts and legal determination, as noted in Khalil, in addressing the question of materiality). A motion

15

to dismiss is not properly utilized to test the sufficiency of the Government's evidence in support of the charged offenses.

In support of their argument that the facts as alleged in the indictment do not state as a matter of law that the false statements concern a matter within the government's jurisdiction, Defendants' focus on the indictment's allegation that the certified payroll forms (containing the false statements about federal employment tax withholdings) were submitted to the subcontractor M.E. and that the general contractor then submitted the forms to the CDC.  [Doc. 27 at 2-3, 12-17, citing Doc. 1, Count 1 ¶¶ 6, 7, 12].  Defendants rely on the decisions in United States v. Blankenship, 382 F.3d 1110 (11th Cir. 2004), and Lowe v. United States, 141 F.2d 1005 (5th Cir. 1944),[3] to support their argument.  [Doc. 27 at 12-17].

In United States v. Gonzalez, 540 Fed. Appx. 967 (11th Cir. 2014), the court addressed the parameters of the jurisdictional element of § 1001.

> To be a crime under 18 U.S.C. § 1001, a false statement must be made "in any matter within the jurisdiction" of the United States government.  The Supreme Court has stated that this jurisdictional element should "not be given a narrow or technical meaning" and applies to "myriad governmental activities." . . .  [T]he false statement must concern the

---

[3]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

"authorized functions of an agency or department" rather than "matters peripheral to the business of that body." . . . "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." . . . In determining whether or not a statement is made "in any matter within the jurisdiction" of the United States government, an important consideration is whether the federal government had any "power over the specific transaction in which the false statements were made."

Id. at 979 (citations omitted).  As stated by the Eleventh Circuit Court of Appeals in Blankenship, although "the term jurisdiction should not be given a narrow or technical meaning[,] . . . the scope of the term does have limits" as recognized *supra*.  382 F.3d at 1136.   "[T]he key issue in determining whether a statement is within the government's jurisdiction is the authority of the agency to act."  Id. at 1137.

In Blankenship, based on the evidence presented at trial - not on a pretrial motion to dismiss, the court reversed the defendant's § 1001 conviction for making false statements to his employer, Granite, "a private construction company under contract to build roads for the FDOT" which "in turn, was under contract with the USDOT to adhere to federal specifications and requirements." Id. at 1136.  The court, in reaching its decision, relied on "the uncontradicted testimony of the Government's witnesses" at trial demonstrating that "the USDOT dealt exclusively with the FDOT and looked solely to the FDOT to implement its contractual obligations[,]" that the

17

"USDOT was powerless to 'exercise authority' over either Granite or the defendant[,]" and that the "false statements made by the defendant[ ] concerned [his] compliance with the terms of [his employment] contract with Granite, a contract over which the USDOT neither had nor exercised any supervisory power." Id. at 1136-37. "Consequently, [the court held that] the false statements concerned a matter outside the jurisdiction of the federal government." Id. at 1137. The court's fact specific determination, after trial, that the jurisdictional element was not satisfied does not as a matter of law dictate dismissal of the indictment herein. Likewise, the specific factual scenario alleged in the indictment under scrutiny in Lowe does not dictate dismissal of the instant indictment.

In Lowe, the defendant was an employee of a dry dock and shipbuilding company who received wages based on hours worked and who falsified the number of hours worked on a particular date to the company's payroll department. At that time, the company was under contract to build ships for the United States Marine Commission. The contract provided for reimbursement to the company for payroll payments for work on the contract from the U.S. Treasury. 141 F.2d at 1006. The court held that "the alleged fact that the United States reimbursed the company for its payroll payments was [not] sufficient to make the alleged misrepresentation with

18

respect to the payroll entry a matter within the jurisdiction" of a federal agency.  Id. Everything about the relationship between the defendant and the private company, including his supervision and payment of wages, "were matters within the exclusive dominion of his private employer[,]" such that nothing about the government contract had any impact on the defendant's employment.  Id.  Accordingly, the court held, "*In these circumstances*, the *mere* allegation of the existence of the contract providing for reimbursement of payroll payments was not sufficient to make [the defendant's] alleged fraudulent misrepresentation to his employer an offense against the United States."  Id.  Contrary to the statement in Blankenship that Lowe stands for the proposition "that a misrepresentation made to a private company concerning a project that is the subject of a contract between that company and the federal government does *not* [and by implication never can] constitute a misrepresentation about a matter within the jurisdiction of the federal government[,]" the decision in Lowe is constrained by the facts alleged in that indictment, as outlined above, which under those circumstances did not sufficiently allege jurisdiction.[4]

_____

[4]This reading of Lowe is supported by the concurring Circuit Judge's finding that rewording the indictment could have cured the pleading defect and brought the defendant's false statement within the jurisdiction of an agency of the United States for the purposes of stating an offense.  Id. at 1006-07.

Neither <u>Lowe</u> nor <u>Blankenship</u> stand for the proposition, as argued by Defendants, that the false statement must be alleged to have been made directly to the federal agency to avoid dismissal as a matter of law.  And, as the Eleventh Circuit Court of Appeals in <u>United States v. Herring</u>, 916 F.2d 1543 (11th Cir. 1990), stated, "this court has held that false statements need not be presented to an agency of the United States and that federal funds need not actually be used to pay a claimant for federal agency jurisdiction to exist under section 1001."  <u>Id.</u> at 1547 (citing <u>United States v. Suggs</u>, 755 F.2d 1538, 1542 (11th Cir. 1985)); <u>and see</u> <u>United States v. Antigua</u>, 2014 WL 6872493, at *1 n.1 (M.D. Fla. December 3, 2014) ("To the extent Defendant contends that he cannot, as a matter of law, be criminally liable under § 1001 because the Indictment alleges that he made the false statement to his employers as opposed to Medicare, he is mistaken.").  The decision in <u>Suggs</u> does not run afoul of the holding in <u>Lowe</u>.

Additionally, this circuit "typically construe[s] attacks on jurisdictional elements as a challenge to the sufficiency of the evidence supporting that particular jurisdictional element." <u>Gonzalez</u>, 540 Fed. Appx. at 979.  In light of this, in <u>Antigua</u>, while acknowledging the <u>Blankenship</u> court's decision and reliance on <u>Lowe</u>, which according to the <u>Antigua</u> court "restricts the reach of § 1001 when the alleged false

20

statements are made by an employee to his private employer which has a contract with the federal government[,]"[5] the district court nevertheless properly found that whether the defendant's jurisdictional attack "has merit can only be resolved after a development of the facts at trial."  2014 WL 6872493, at *2 ("an attack on the jurisdictional element of a § 1001 prosecution is typically construed as a challenge to the sufficiency of the evidence").  That conclusion is the proper one in this case. Defendants hang their arguments about jurisdiction on a single allegation in the indictment, that is, that Defendants' false statements were initially sent to M.E. before being relayed to the CDC.  At this stage of the proceedings, without consideration of the evidence at trial concerning the nature of the relationships between all of the entities and what, if any, authority the federal government has over the transactions in which the false statements were made, the court should not dismiss Counts 7 through 12 of the indictment.

Defendants also assert that Counts 2 through 6 of the indictment, alleging tax fraud offenses, should be dismissed for violations of their substantive and procedural

---

[5]The court also notes that the § 1001 charges in this case do *not* involve the factual scenario of <u>Lowe</u>, <u>Blankenship</u> or <u>Antigua</u>, that is, this is not a case in which an employee of a company, somehow receiving federal funds, falsified information to his employer.

Fifth Amendment due process rights. [Doc. 30 at 24-33]. Defendants allege that the Government's conduct was outrageous (1) because the tax investigation was conducted by the Department of Labor ("DOL") not the Internal Revenue Service ("IRS"), (2) due to the failure to advise Defendants of their rights under Section 530 of the Revenue Act of 1978, as amended, dealing with reclassification of workers from independent contractors to employees, (3) due to the failure to afford Defendants their rights under Section 530 and various regulations of the Internal Revenue Code and the Treasury Department regarding reclassification of workers, (4) for violating fundamental fairness (not otherwise explained), and (5) "in likely failing to advise the grand jury of the appropriate tax laws" and impairing the grand jury's independent role. [Id. at 25]. In support, Defendants offer an dissertation on Section 530, on various IRS regulations, on tax review levels and appeals allowed by the IRS - for relief from civil tax rulings and penalties - with respect to worker classification, a Memorandum of Understanding ("MOU") between the DOL and IRS regarding tax investigations, and the process for Department of Justice review of proposed tax prosecutions. [Id. at 5-10, 15-23]. After consideration of Defendants' arguments, the court agrees with the Government that the claims of due process violations lack any merit. [Doc. 41 at 7].

22

In seeking dismissal of Counts 2 through 6, Defendants, alleging outrageous government misconduct for the reasons stated *supra*, rely on the Supreme Court decision in United States v. Russell, 93 S. Ct. 1637 (1973), and on the court's supervisory powers. [Doc. 30 at 28-29]. Defendants' reliance is severely misplaced, especially with respect to the decision in Russell, a decision arising out of facts inapposite to Defendants' allegations of governmental misconduct relating to the decisionmaking process by prosecutorial authorities but not involving commission of the conduct for which Defendants are being held accountable.

The facts in Russell concerned the government's involvement during the investigation of the criminal conduct resulting in an indictment. These governmental actions facilitated the commission of the crime and allowed the criminal conduct to continue with government assistance, and they supported an entrapment defense at trial. Russell, 93 S. Ct. at 1641-42. The Supreme Court rejected the defendant's attempt to establish a constitutional violation which would result in dismissal of an indictment "when it is shown that the criminal conduct would not have been possible had not an undercover agent 'supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels.'" Id. at 1642 (citation omitted). The Supreme Court noted in dicta that:

23

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ., the instant case is distinctly not of that breed. . . .   The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

Id. at 1643 (citations omitted).  That day has not yet arrived.  After forty years, no such case has come before the Supreme Court;  nor has any case been dismissed in the Eleventh Circuit Court of Appeals based on a finding of outrageous government misconduct.  See, e.g., United States v. Valencia Vergara, 264 Fed. Appx. 832, 834 (11th Cir. 2008) (noting that neither the Eleventh Circuit Court of Appeals nor the Supreme Court "has reversed a conviction because of a failure to dismiss a case based on government misconduct"); United States v. Durham, 106 F. Supp. 3d 1301, 1311 (N.D. Ga. 2015) ("Neither the Supreme Court nor the . . . Eleventh Circuit[ ] has ever reversed a case on the ground of outrageous government conduct").

In fact, the Eleventh Circuit Court of Appeals recently stated, "We have never applied the outrageous government conduct defense and have discussed it only in dicta." United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011).  It is apparently questionable whether such a defense is even recognized in the Eleventh Circuit, Id. (the court has "never acknowledged the existence of the outrageous

24

government conduct doctrine"), and if the court had recognized the defense, "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts[,]" Id. at 1111-12 ("'Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees.'") (citation omitted).[6]   And Defendants offer no decision in any other circuit with allegations of comparable misconduct as asserted herein where a court has found the Government's conduct established a due process violation.

Even if the court considered Defendants' allegations of misconduct, the court does not find that this case presents "'the extreme circumstances that must exist before a due process violation will be found:  law enforcement techniques will be deemed unconstitutional only if they violate that fundamental fairness, shocking to the

---

[6]The District Court for the Southern District of Florida noted that the doctrine espoused in Russell "comes up almost exclusively within the context of government involvement in the defendant's crime and entrapment." United States v. Padilla, 2007 WL 1079090, *3 (S.D. Fla. April 9, 2007).  The court also noted that part of the difficulty in determining the contours of the doctrine is based on the fact that no defendant has ever successfully argued that the doctrine is applicable to a criminal proceeding.  Id.  This fact, the court noted, "bears testament to the claim's severely narrow scope."  Id.; and see United States v. Guerrero, 2013 WL 5530613, at *3 (N.D. Ga. May 9, 2013) (noting that the decision in Jayyousi casts doubt on the continuing validity of the outrageous government misconduct defense).

25

universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.'" Valencia Vergara, 264 Fed. Appx. at 834 (quoting United States v. Savage, 701 F.2d 867, 868 (11th Cir. 1983)). As set forth *supra*, Defendants' complaints center on the Government's failure to afford them the review procedures and processes available when the IRS is determining civil tax liability and penalties and on the Government's failure to follow internal agency rules and regulations, including the MOU between the DOL and IRS, in bringing the prosecution and presenting the case to the federal grand jury. [Doc. 30 at 5-10, 15-23]. Unfortunately for Defendants, the case before the court is not civil proceeding, and the statutes, regulations and rules relied on by Defendants do not afford them any substantive or procedural due process rights in this criminal prosecution.[7]

With respect to Section 530 of the Revenue Act of 1978, the court agrees with the decision of the Fourth Circuit Court of Appeals, and the cases relied on by that court, "that § 530, a civil provision, has no . . . applicability to a criminal prosecution

---

[7]The cases cited by Defendants, United States v. Solomon, 437 F.2d 110 (5th Cir. 1971), United States v. Dahlstrum, 493 F. Supp. 966 (C.D. Cal. 1980), and Larson v. United States, 69 A.F.T.R.2d 92-845 (D.C. Mt. 1992), are factually inapposite and do not support their arguments. All involve IRS civil summons issued as part of a civil tax investigation and the appropriateness of those summons. As best the court can determine, no such investigatory tool was utilized or allegedly abused during the instant investigation.

under § 7602(2)[,]" involving the alleged submission of a false and fraudulent Form 941 to the IRS. United States v. Cox, 856 F.3d 187, at *3 (4th Cir. 1988) (unpublished) (citing United States v. MacKenzie, 777 F.2d 811, 817 (2nd Cir. 1985); United States v. McLaughlin, 663 F.2d 949, 952 (9th Cir. 1981)).  The court in Cox rejected the application of that provision to the defendants' defense that "they had a 'reasonable basis' for treating the [employees] as independent contractors . . . ."  Id.  In MacKenzie, 777 F.2d at 813-14, the court rejected the same arguments made by Defendants herein, that is, that classification of workers as employees or independent contractors is a complex and confusing area of the law, that they are confused, that the government is confused and that § 530 should be applied to aid in reaching the proper designation in connection with the charged criminal offenses. Id. at 813-15.  The court acknowledged "that there are doubtful cases and doubtless Congress, when it adopted section 530, intended to protect from *civil* liability those who reasonably made a determination that a given individual was an independent contractor rather than an employee." Id. at 815 (emphasis added).  However, the court found, "The enactment of [§ 530] does not disclose any intent to preclude criminal prosecutions of violations of the withholding laws; the silence of the congressional history in this regard is significant."  Id. at 816-17 (noting "that the suggestion that section 530 provided a

  - 

defense in a prosecution for failure to withhold has been rejected") (citing McLaughlin, 663 F.2d at 952).

Defendants fair no better with the attempt to invoke a concept of government misconduct based on alleged failures to comply with internal agency rules and regulations.  No substantive or procedural rights flow to Defendants from an agency's regulations and rules governing internal operating procedures.  See, e.g., United States v. Bridges, 344 F.3d 1010, 1020 (9th Cir. 2003) (rejecting the defendant's contention that his conviction should be vacated due to the government's violation of the Taxpayer Bill of Rights); United States v. Goldberg, 105 F.3d 770, 777 (1st Cir. 1997) (rejecting the defendant's complaint "that the government did not follow its own internal rules for tax prosecutions or reveal to him information about this decision" because the "government's procedures do not create substantive rights"); San Pedro v. United States, 79 F.3d 1065, 1070-71 (11th Cir. 1996) ("It is well established that the [United States Attorneys Manual ("USAM")] only provides guidance to officials at the Department of Justice and does not have the force of law.") (citing USAM § 1-1.000 (Manual "is not intended to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal")); United States v. Michaud, 925 F.2d 37, 42 (1st Cir. 1991) (rejecting the

defendant's argument that the indictment should be dismissed based on the IRS agent's failure to comply with the Internal Revenue Manual in conducting the investigation because "violations of IRS fraud referral rules and regulations do not constitute a violation of constitutional rights"); Simpson v. United States, 1993 WL 478850, at *4 (N.D. Fla. July 13, 1993) ("The regulations of the IRS, including the regulations in the Special Agents Handbook, regulate the internal administration of the IRS and do not confer enforceable or actionable rights upon the taxpayer."); United States v. Posner, 594 F. Supp. 916, 922 n.10 (S.D. Fla. 1984) (finding that, even if the defendant established a violation of some IRS procedure, "the Court does not have authority to compel an agency of the government to comply with established procedures, absent some breach of the law"); United States v. Harvey, 560 F. Supp. 1040, 1081 n.10 (S.D. Fla. 1983) ("provisions of the [USAM] are not binding on the Government").  And, as the Government points out, the MOU relied on by Defendants specifically provides that "[t]his MOU does not confer any rights or benefits on any third party."  [Doc. 30, Exhibit 2 ¶ 12].

In United States v. Cormier, 639 F.2d 1177 (5th Cir. Unit B 1981), the court rejected a challenge to an indictment based on the argument made by Defendants herein, that is, failure to comply with the IRS and/or Department of Justice review

process before bringing a criminal tax prosecution.  In <u>Cormier</u>, involving criminal charges for illegally receiving Social Security funds, the defendant argued that, although advised that she had civil remedies, including review of the administrative determination which she requested, the "Social Security Administration contravened its own regulations by denying her request for an adjudicatory hearing before undertaking formal prosecution." <u>Id.</u> at 1179-80.  Finding that the provisions of the manual relied on by the defendant "unquestionably applied" and that the agency "violated internal regulations by instituting criminal proceedings against Cormier without first affording her informal review[,]" the Court nonetheless rejected the defendant's arguments:

> [N]either the Constitution nor statute mandates compliance with the Social Security Administration regulations at issue, nor can Cormier claim a due process violation in that she relied on the Social Security Administration regulation or that its breach affected her conduct since her failure to file annual income reports and her receipt of benefits occurred long before the agency breached its own rule.

<u>Id.</u> at 1180 (citing, *inter alia*, <u>Kirkland Masonry, Inc. v. Commiss'r of Internal Revenue</u>, 614 F.2d 532 (5th Cir. 1980) ("holding that an Internal Revenue Service Handbook directive to agency employees does not suffice to create a duty to the public")).  The court denied the defendant's motion to dismiss the indictment.

30

Likewise, the Government was not compelled by the Constitution or statute to abide by any agency policies providing for review and a hearing before institution of criminal tax proceedings against Defendants, and, as in Cormier, Defendants' allegedly criminal conduct in submitting false Form 941 forms to the IRS occurred before any alleged breach of agency rules such that Defendants cannot argue reliance on those provision necessary to establish a due process violation.

The court also finds that Defendants have failed to present grounds for this court to exercise its supervisory powers and dismiss the indictment. "A district court may dismiss an indictment pursuant to the federal courts' supervisory power. However, dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." United States v. White, 846 F.2d 678, 693 (11th Cir. 1988) (citations and internal quotation marks omitted); and see Turner v. United States, 2012 WL 3848653, at *14 (N.D. Ala. August 30, 2012) (same). For the reasons stated above, the court rejects Defendants' arguments based on alleged Government misconduct in violating the MOU, in failing to follow agency procedures and policies in bringing the criminal tax prosecution or in not complying with Section 530 or other IRS regulations regarding worker reclassification as grounds for exercising its supervisory powers. [Doc. 30 at 30].

31

Defendants also contend that the Government "likely" failed to inform the grand jury of the appropriate tax laws and that, based on their interpretation of various regulatory laws and rules and discovery material, the grand jury returned an indictment that contained misleading allegations or "suggestions" regarding Defendants' conduct and the consequences of that conduct requiring the court to exercise its supervisory authority due to misconduct before the grand jury.[8] [Id. at 30-33]. Defendants offer no legal authority, based on similar factual allegations, in support of these arguments. [Id. at 29-33].

"Judicial review of grand jury matters is narrowly circumscribed by the Supreme Court because the proceedings are cloaked in a presumption of regularity." United States v. Sigman, 2013 WL 5890718, at *1 (S.D. Fla. November 4, 2013); and see In re Grand Jury Proceedings, (Williams, GJ88-1), 995 F.2d 1013, 1016 (11th Cir. 1993) ("The court . . . has only [a] limited role in dealing with the grand jury. A district court simply does not intervene in the normal operations of a grand jury investigation."). "As

---

[8]In fact, many of the allegedly misleading or false representations in the indictment identified by Defendants are actually attacks on the sufficiency of the evidence or challenges to whether the Government will be able to present evidence to support the allegations in the indictment. [Doc. 30 at 31 ("Allegation 10"), at 32 ("Allegation 16" and "Allegation 18")]. As previously discussed, a motion to dismiss is not properly utilized to challenge the sufficiency of the evidence in whatever form presented by Defendants.

a result, dismissal of an indictment is an 'extreme sanction' that should be infrequently utilized." <u>Sigman</u>, 2013 WL 5890718, at *1.  Generally, "'a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.'" <u>United States v. Cosme</u>, 134 Fed. Appx. 391, 392 (11th Cir. 2005) (quoting <u>Bank of Nova Scotia v. United States</u>, 108 S. Ct. 2369, 2373 (1988)).  As the Eleventh Circuit has stated, "Under <u>Bank of Nova Scotia</u>[ ], the district court must ask whether the error before the grand jury substantially influenced the grand jury's decision to indict, or [whether] there is grave doubt that that decision [to indict] was free from such substantial influence [of such violations.]" <u>United States v. Vallejo</u>, 297 F.3d 1154, 1165 (11th Cir. 2002)  (quoting <u>Bank of Nova Scotia</u>, 108 S. Ct. at 2371) (internal quotation marks omitted); <u>see also</u> <u>United States v. Exarhos</u>, 135 F.3d 723, 726 (11th Cir. 1998) (same).  "Additionally, the Supreme Court has noted that a petit jury's subsequent guilty verdict renders 'any error in the grand jury proceeding connected with the charging decision [ ] harmless beyond a reasonable doubt.'" <u>Cosme</u>, 134 Fed. Appx. at 393 (quoting <u>United States v. Mechanik</u>, 106 S. Ct. 938, 942 (1986)).  A defendant carries the burden of establishing improper conduct before the grand jury.  <u>See</u> <u>United States v. US Infrastructure, Inc.</u>, 576 F.3d 1195, 1214 (11th Cir. 2009) ("A defendant claiming grand jury abuse 'has the burden of

33

showing that the Government's use of the grand jury was improperly motivated.'") (citation omitted); <u>United States v. Alred</u>, 144 F.3d 1405, 1413 n.7 (11th Cir. 1998) ("'[There is] the presumption that the government is acting in good faith, and . . . it's the defendant's burden to prove the reason and abuse . . . .'") (citation omitted).

With respect to Defendants' claims of misleading allegations or suggestions regarding Defendants' conduct and the consequences of that conduct, the court notes that the mere fact of the presentation of inaccurate or misleading evidence is not sufficient to establish that an indictment should be dismissed.  In <u>United States v. Garate-Vergara</u>, 942 F.2d 1543 (11th Cir. 1991), the Eleventh Circuit Court of Appeals reviewed a trial court's denial of a motion to dismiss based on allegations of government misconduct flowing from false testimony presented to the grand jury. <u>Id.</u> at 1550.  In rejecting the defendant's arguments, the court began by reiterating "that dismissal of an indictment for prosecutorial misconduct is an 'extreme sanction which should be infrequently utilized.'. . .  The defendant must show unfair or actual prejudice." <u>Id.</u> (citations omitted).  The court continued:

> This court has indicated that the possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct.

34

Id. (quoting United States v. DiBernardo, 775 F.2d 1470, 1475 (11th Cir. 1985)).

Defendants have not alleged, must less established, that the Government knowingly presented perjured testimony to the grand jury nor do their allegations regarding misrepresentations in the indictment and unsupported suggestions in the language of the indictment constitute such an allegation.  See DiBernardo, 775 F.2d at 1475 (court found that, although the possibility existed that an agent, due to mental incapacity unknown at the time, may have testified falsely to the grand jury, absent proof that "prosecutor intentionally placed false testimony before the grand jury" dismissal of the indictment is not warranted).  In United States v. Hyder, 732 F.2d 841 (11th Cir. 1984), noting that the Eleventh Circuit followed the principles espoused by the Sixth and Ninth Circuit Courts of Appeal in addressing claims of misconduct before the grand jury, the court stated:  "[W]e refuse to adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that later may prove to be questionable.  Such a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury. . . .  Moreover, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or

35

incompetent evidence." Id. at 845 (citations and internal quotations omitted); and see United States v. Kannell, 545 Fed. Appx. 881, 885 (11th Cir. 2013) ("'a grand jury indictment that is valid on its face may not be challenged on the ground that the grand jury acted on the basis of inadequate or incompetent evidence'") (citation omitted).

Additionally, there is no legal error in the government failing to present, if any exists, exculpatory evidence to the grand jury. See United States v. Waldon, 363 F.3d 1103, 1109 (11th Cir. 2004) ("The government is under no duty to bring exculpatory evidence to the grand jury's attention.") (citing United States v. Williams, 112 S. Ct. 1735, 1744-46 (1992)). In Williams, the Supreme Court rejected the defendant's contention that exculpatory evidence must be presented to the grand jury relying on the Court's decisions in Costello v. United States, 76 S. Ct. 406 (1956), and Bank of Nova Scotia. Citing to Costello, the Supreme Court noted its acceptance of the proposition that "'[i]t would run counter to the whole history of the grand jury institution' to permit an indictment to be challenged 'on the ground that there was inadequate or incompetent evidence before the grand jury.'" Williams, 112 S. Ct. at 1746 (quoting Costello, 76 S. Ct. at 409). A proposition, which according to the Supreme Court in Williams, was reaffirmed in Bank of Nova Scotia in which the Court held that "'the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the

36

indictment,' and that 'a challenge to the reliability or competence of the evidence presented to the grand jury' will not be heard." <u>Williams</u>, 112 S. Ct. at 1746 (quoting <u>Bank of Nova Scotia</u>, 108 S. Ct. at 2377).   Most importantly for the purposes of resolving Defendants' claims about the evidence presented to this grand jury, the Supreme Court stated, "A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading.'   Our words in <u>Costello</u> bear repeating:   Review of facially valid indictments on such grounds 'would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it].'" <u>Id.</u> (quoting <u>Costello</u>, 76 S. Ct. at 409).  The court finds that Defendants' claims regarding alleged misrepresentations and false suggestions to the grand jury apparently gleaned from a reading of the indictment are insufficient to carry their burden of showing an abuse of the grand jury which resulted in prejudice to them.

Harkening back to their arguments about the MOU, IRS regulations and rules and labor and employment laws, Defendants contend that it is "likely" and that they "believe[ ]" the Government failed to properly advise the grand jury on the law regarding the tax charges in the indictment.  [Doc. 30 at 25, 30].  Courts have also concluded that the general rule that an "indictment 'will not be the subject of

independent scrutiny and is given a presumption of regularity[, ]'. . . is 'just as applicable to a challenge of inadequate instructions as inadequate evidence . . . .'" United States v. Smith, 2004 WL 784521, *2 (W.D. Tenn. January 26, 2004) (citations omitted); see also United States v. Slade, 2013 WL 3344341, at *4 (E.D. Pa. July 3, 2013) (citing United States v. Hart, 513 F. Supp. 657, 658 (E.D. Pa. 1981)) (same). And, even if a defendant establishes that erroneous instructions were given to a grand jury, this fact does not automatically invalidate the indictment; "[t]he defendant still must demonstrate the erroneous instructions created 'grave doubt' that the decision to indict was free from the substantial influence of such violations." United States v. Espy, 23 F. Supp. 2d 1, 9-10 (D. D.C. 1998). On this claim, Defendants engage in nothing more than rank speculation based on their view of the laws and regulations applicable to the tax charges in Counts 2 through 6. Such speculation is insufficient to even obtain access to pertinent grand jury records, see United States v. Burke, 856 F.2d 1492, 1496 (11th Cir. 1988) ("A defendant's effort to obtain grand jury materials can only succeed with a showing of 'particularized need[,]'" which is not established "by a general allegation that grand jury materials are necessary for preparation of a motion to dismiss."); United States v. Stein, 429 F. Supp. 2d 633, 639-40 (S.D. N.Y. 2006) ("because the 'proper functioning of the grand jury system depends on the

38

secrecy of the grand jury proceedings,' a party may obtain disclosure of grand jury transcripts under Rule 6(e) only by 'a strong showing of particularized need' that outweighs the need for continued secrecy") (citations omitted), much less invoke this court's supervisory power to dismiss these counts of the indictment.

## III.   Conclusion

For the foregoing reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 27 and 29] to dismiss Counts 2 through 12 of the indictment, and to strike from the indictment allegations pertaining to those Counts, be **DENIED**.

### <u>Motion for Discovery Concerning Selective Prosecution</u>

Defendants Tabares and Bazantes seek an order from the court directing the Government (not delineated as limited to the Northern District of Georgia or for the entire Department of Justice) to produce, for the calendar years 2008 through 2015, statistics concerning:

> (1)    . . . all prosecutions brought under: (a) the Davis-Bacon Act, 18 U.S.C. § 276; (b) for failing to collect, account for and pay over to the Internal Revenue Service all of the FICA (employment taxes) due and owing under 26 U.S.C. § 7202; and, (c) making and/or using false writings and documents, certified payrolls, to the Executive Branch of the United States, in violation of 18 U.S.C. § 1001(a)(3) and 2.   Collectively referred hereafter as "*DBA, employment tax and certified payroll cases*;"

39

(2)     the policies and directives concerning the investigation and prosecution of DBA, employment tax and certified payroll cases by the United States Department of Justice ("DOJ"), the Internal Revenue Service ("IRS"), and the United States Department of Labor ("DOL"); and

(3)     all DOJ, IRS and DOL documents that address the decision to prosecute Messrs. [Tabares] and Bazantes.

[Doc. 31 at 1-2 (emphasis in original].  Defendants contend that they are entitled to this discovery having presented "some evidence of differential treatment of similarly situated members of other . . . protected classes."  [Doc. 31 at 3-4, quoting United States v. Armstrong, 116 S. Ct. 1480, 1489 (1996)].  This evidence is based on the following.  First, that counsel for Defendants "are aware of only six (6) other prosecutions during the period 2005 to date charging DBA, employment tax and certified payroll violations" - none of which (based on the list provided) were prosecuted in the Northern District of Georgia.  [Id. at 3-4].  Defendants assert that none of the defendants prosecuted were "owner/operators of large companies" or that the only violations of DBA, employment tax and certified payroll laws prosecuted involved defendants who "either underpaid their workers; stole, via not paying over payroll deductions for fringe and wage benefits; and/or made false statements to conceal these offenses . . . ." [Id.].  And Defendants state that they sought information

40

about a prior audit of IWES in 2008 which the Government declined to provide and

contend that they "found that the government knew but chose not to prosecute a similar

contractor - Eagle Managed Systems, whose owner was involved but not charged in

the prosecution of United States v. Marchelletta, et. al., No. 1:07-cr-107 TCB (N.D.

Ga.)." [Id. at 5-7].[9]  The Government opposes the motion for discovery stating that

Defendants have not met their heavy burden to obtain discovery primarily due to their

failure to allege that their selective prosecution claim is based on "constitutionally

impermissible motives such racial or religious discrimination, or the defendants'

exercise of constitutional rights." [Doc. 42 at 2-3].  And the Government points out

that Defendants' reliance on prosecutions for violations of the Davis-Bacon Act as

comparator evidence is misplaced - no such charges are contained in this indictment.

---

[9]This prosecution is not on the list of six cases involving DBA, employment tax
and certified payroll prosecutions cited by Defendants - and for good reason - the
Marchelletta indictment did not allege any such violations nor criminal conduct. [1:07-
cr-107, Doc. 1].  And the exhibits referred to by Defendants in further support of their
conclusion are a Fair Labor Standards Act narrative apparently from 2003, pertaining
to payment of minimum wage and overtime by Eagle Managed Subcontractors and a
February 2015 internet post, citing to the signs presented and flyers passed out by three
labor union protestors asserting that a company, Mulkey Enterprises, used
undocumented workers on a hospital project - an allegation that the posting stated
could not be confirmed.  [Doc. 31, Exhibits 7 and 8].

AO 72A
(Rev.8/82)

[Id. at 3-4].  The court finds that Defendants have not presented "some evidence" of selective prosecution in order to obtain the sweeping discovery they seek.

It is well settled that the executive not the judiciary is entrusted by the Constitution with the decisionmaking authority as to which crimes and individuals to indict and that interference with that decision making process is restricted to a very narrow set of circumstances involving infringement of the constitution.  This is so because "[a] selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive."  Armstrong, 116 S. Ct. at 1486.  Accordingly,

> Prosecutors are given broad discretion in deciding against whom to focus limited prosecutorial resources, and a strong "presumption of regularity supports . . . [those] decisions.". . . But they must exercise their charging discretion within constitutional constraints, including those "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment."

United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000) (citation omitted).  A defendant who seeks to challenge that prosecutorial discretion "bear[s] a 'demanding' burden."  Id.  "'In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present *clear* evidence to the contrary.'" Id. (citation omitted; emphasis in original); see also United States v. Brantley, 803 F.3d 1265, 1271 (11th Cir. 2015) ("in order to obtain an evidentiary hearing on a selective

42

prosecution claim, the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution") (citations and internal quotation marks omitted); United States v. Jennings, 991 F.2d 725, 730 (11th Cir. 1993) ("An evidentiary hearing is not automatically required; instead, the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution. . . .") (citations and internal quotation marks omitted).

"The requirements for a selective-prosecution claim draw on 'ordinary equal protection standards.'" Armstrong, 116 S. Ct. at 1487 (citation omitted). A defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. (citation omitted); and see Brantley, 803 F.3d at 1271 (same). Accordingly, to succeed Defendants "must establish two elements: (1) the discriminatory effect prong of this test requires a showing that 'similarly situated individuals were not prosecuted' . . . and (2) '[t]he discriminatory purpose prong requires that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" Brantley, 803 F.3d at 1271 (citations omitted). To establish the necessary discriminatory purpose, as the Government correctly points out, Defendants "must show that [their] prosecution was predicated

43

on a constitutionally impermissible motive, such as on the basis of race or religion, or in retaliation for [their] exercise of constitutional rights.'" United States v. Brown, 516 Fed. Appx. 872, 873 (11th Cir. 2013) (citation and internal quotation marks omitted); and see Brantley, 803 F.3d at 1271 ("the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification") (citations and internal quotation marks omitted); United States v. Jordan, 635 F.3d 1181, 1188 (11th Cir. 2011) (same).  The court has not found any case, nor have Defendants pointed to such a case, where a discriminatory effect was found absent the defendant pointing to a prosecutorial decision based on a suspect classification, such as race.  And see Armstrong, 116 S. Ct. at 1487 (a defendant "must show that similarly situated individuals of a different race were not prosecuted"); United States v. Howard, 2005 WL 3097885, at *2 (M.D. Ala. November 18, 2005) ("Any equal protection challenge to selective enforcement or prosecution must be based on racial discrimination or some other protected characteristic.").

And to establish the discriminatory effect, that is, that similarly situated persons not within the suspect classification were not prosecuted, the Eleventh Circuit Court of Appeals has explained:

44

> [A] similarly situated person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant - so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan - and against whom the evidence was as strong or stronger than that against the defendant.

Jordan, 635 F.3d at 1188 (citation and internal quotation marks omitted); and see Brantley, 803 F.3d at 1271-72 (same).

With these requirements in mind, the Supreme Court stated, "The justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." Armstrong, 116 S. Ct. at 1488. To obtain discovery, courts "'require some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." Id. (citation omitted). The Supreme Court stated that "the required threshold - a credible showing of different treatment of similarly situated persons - adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." Id. at 1489. Defendants have not satisfied this burden in this case and are not entitled to discovery.

45

Defendants simply have not presented some evidence of a discriminatory motive nor discriminatory effect based on the "'differential treatment of similarly situated members of other races or protected classes.'" Howard, 2005 WL 3097885, at *2 (quoting United States v. Quinn, 123 F.3d 1415, 1426 (11th Cir. 1997)).  As best the court can determine, Defendants base their claim of selective prosecution on the allegation that none of the defendants prosecuted in the six cases listed in the motion were "owner/operators of large companies" or that the only violations of DBA, employment tax and certified payroll laws prosecuted involved defendants who "either underpaid their workers; stole, via not paying over payroll deductions for fringe and wage benefits; and/or made false statements to conceal these offenses . . . ."[10]  [Doc. 31 at 3-4].  These are not suspect classifications nor groups accorded constitutional protection such than an equal protection claim can be supported.   Likewise, Defendants' "some evidence" in support of a discriminatory effect is insufficient to

_____

[10]The court is not quite sure how this listing of the types of conduct engaged in by charged defendants assists Defendants in their argument.  Based on the allegations in the indictment, the Government contends that Defendants "stole, via not paying over payroll deductions for . . . wage benefits" by not filing a Form 941 including all qualifying workers on the CDC project and also "made false statements to conceal these offenses" when submitting the false certified payroll forms to the CDC.  [Doc. 1; Doc. 31 at 4].

46

establish that the defendants in the six cases listed or that Eagle Managed Systems are similarly situated comparators.

None of the six cases relied on by Defendants involved a prosecution in the Northern District of Georgia undercutting reliance on any inference that might flow from the circumstances of those prosecutions.  See United States v. Bass, 536 U.S. 862, 863-64, 122 S. Ct. 2389, ___ (2002) (per curiam) (rejecting the use of nationwide statistics demonstrating that blacks are charged with death-eligible offenses more than twice as often as whites as "some evidence" to allow discovery on a selective prosecution claim and stating that "[e]ven assuming that the Armstrong requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in [the defendant's] case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*") (emphasis in original); Jordan, 635 F.3d at 1188 (same).  The fact that Defendants are not *aware*[11] of any other prosecutions except for the six listed is of no moment absent

---

[11]As Defense Counsel are well *aware,* many prosecutions - or failure to prosecute decisions - are based on factors that have nothing to do with the characteristics of the potential defendant, such as, strength of the case, enforcement priorities, plea bargaining and cooperation which could result in the charges brought, if any, not reflecting the most serious offenses committed.  The fact that Defendants only found six cases (without explanation as to the nature of the search conducted) that they characterize as being of the same nature as the charges brought herein frankly

47

some evidence that in the Northern District of Georgia similarly situated comparators were not charged - comparators as defined in <u>Jordan</u>.   And the one instance that Defendants allege shows non-prosecution of a similarly situated entity, Eagle Managed Systems, is woefully insufficient.   The facts that this entity (1) was not charged in a prosecution for filing false income tax returns - having nothing to do with failure to file a Form 941 for workers' employment wages as alleged herein - and (2) was named in a 2003 FLSA report - also having nothing to do with the charges in this case (in addition to being applicable to a time frame years before the underlying charged conduct) - do not constitute some evidence of selective prosecution.[12]   Defendants have produced *no* evidence to support a selective prosecution claim and are not entitled to the sweeping discovery that they seek.

For these reasons, the court **DENIES** Defendants motion [Doc. 31] for discovery concerning selective prosecution.

---

carries very little weight with the court.

[12]Similarly, Defendants continued reference to Davis-Bacon Act prosecutions, a crime not charged in the instant indictment, does not further their arguments.

## **Motion to Suppress**

Defendants Tabares and Bazantes seek to suppress evidence obtained as the result of execution of a federal search warrant on April 11, 2013, at the IWES Contractors' office located at 5151 Brook Hollow Parkway, Suite 200, Norcross, Georgia.   [Doc. 28].   Defendants, contending that the affidavit for the warrant contained false and misleading information, seek a Franks[13] hearing, and contending that the Government has failed to disclose information regarding the relationship between the government and various union employees which would assist in suppressing evidence, seek "a hearing to probe" the circumstances surrounding the seizure of documents, and Defendants assert that the affidavit failed to establish probable cause for the seizure and search of computers and other electronic devices and that identified items seized exceeded the scope of the warrant.  [Id. at 2-3, 11-12]. The Government opposes the motion to suppress arguing that Defendants have not carried their burden to obtain a Franks hearing, that the affidavit for the warrant establishes probable cause for the search of the computers and other electronic devices and that Defendants' conclusory assertion that the search exceeded the scope of the warrant is insufficient but that, nonetheless, the items seized fell within the scope of

---

[13]See Franks v. Delaware, 98 S. Ct. 2674 (1978).

the warrant.  [Doc. 40].  With respect to Defendants' request for a hearing to obtain evidence regarding the agency relationship between the government and certain union representatives, the Government advised that they did not oppose holding a hearing for that limited purpose.  [Id. at 4-5].  The circumstances surrounding the hearing that was conducted and the results thereof will be addressed *infra*.

After consideration of the argument of the parties, the record before the court and relevant legal authority, the court finds that Defendants are not entitled to a Franks hearing, that the affidavit established probable cause to search the computers and electronic devices seized and that the search did not exceed the scope of the warrant.

## I.    Search Warrant and Affidavit

On April 5, 2013, the Government presented to Magistrate Judge Brill a search warrant for "IWes Contractors"[14] to search for (1) information, including Social Security numbers, reflecting the identity of employees, customers or business associates including the contents of computers and related devices, (2) all tax forms, work papers and related documents for 2011 to present for IWES Contracts and IWES

---

[14]The business is identified in the search warrant, application and affidavit as "IWes" instead of "IWES" as has been used in this report and recommendation. Unless quoting from the search warrant, application and affidavit, the court will continue to use "IWES."

Drywall, (3) correspondence related to tax returns and preparation, (4) books, etc.,
related to income tax and employment tax law, (5) Georgia DOL and US DOL forms
and publications, (6) employee files, including pay stubs, payroll records, withholding
forms, and other government forms, (7) corporate bookkeeping records and financial
records for IWES for 2011 to present, (8) bank account records, (9) corporate records
and stock registers reflecting IWES ownership, (10) all correspondence between and
among IWES and employees, in any form, regarding payroll, federal employment
taxes, and related compensation matters including complaints about reporting wages
to Georgia DOL, the Social Security Administration ("SSA") and the IRS, (11) all
records and address books containing names, addresses and phone numbers, (12)
workers' compensation policies, (13) project files and listings and agreements with
contractors and subcontractors, (14) with respect to any computer or other electronic
device ("computer"), containing the information sought, evidence, as detailed, of who
owned, operated and controlled the computer at the time items were created, evidence
of software - or the lack thereof - allowing others to control the computer, evidence of
attached storage devices, evidence of counter-forensic programs designed to eliminate
data, evidence of when the computer was used, passwords encryption keys and other
access devices, documents and manuals necessary for computer access and contextual

51

information to assist in understanding evidence; and (15) and (16) allowing for searching of computers on site, but if unable, allowing for the seizure of the computer and removal to allow for off-site execution of the search warrant. [Doc. 45-2 ("Search Warrant")].

In support of the Search Warrant, Special Agent US DOL OIG Andrew McFarlane ("Affiant") provided the following information. [Id. 45-1 ("Affidavit")]. Affiant, with DOL OIG for 3.5 years and who had conducted and participated in numerous investigations of government fraud, based the information in the Affidavit on personal observations and his training and experience, as well as on information from third parties. [Id. ¶¶ 1-3]. Affiant submitted that the information provided established violations of 18 U.S.C. §§ 1001, false statements, and 1341, mail fraud, 42 U.S.C. § 408(1)(A), false information to the SSA, and 26 U.S.C. § 7201, willful attempt to evade payroll taxes, and established probable cause that evidence of such violations would be found in the offices of IWES. [Id. ¶ 4].

Affiant first provided background information that IWES was a sub-contractor of Mulkey Enterprises ("Mulkey") to hang and finish drywall at the Center for Disease Control ("CDC") and that Mulkey was a sub-contractor for Beck Construction Company ("Beck"), the prime contractor for the project funded by the US government.

[Id. ¶ 5].   Affiant identified Defendants' relationship to IWES and that Arcesio Carmona was human resources director for IWES.   The investigation began approximately four months earlier based on information received from "witness J.G., and four additional witnesses," who were formerly employed by IWES and worked on the CDC project.   Affiant stated:

> [They provided] documentation and statements to support the allegation that IWes submitted false information on Certified Payroll forms required by the Davis Bacon Act, 40 U.S.C. 276a (DBA), to conceal their willful failure to deduct payroll taxes as required by the Internal Revenue Code, 26 USC 7201, in violation of 18 U.S.C. § 1001.   In failing to withhold payroll taxes and report wages paid to employees, IWes caused false information to be reported to the [SSA] as to whether wages were paid for employment for employees working on the CDC project in violation of 42 U.S.C. Section 408(a)(1)(A).

[Id. ¶¶ 5-7].   After providing information on the DBA and federal employment taxes, Affiant set forth evidence in support of the alleged violations.

J.G., a union representative, reported to Affiant receiving complaints alleging IWES was misclassifying workers as independent contractors and not deducting and paying payroll taxes, and he provided documents obtained from a dumpster containing discarded trash from IWES offices.   Included in the documents "was a payroll spreadsheet identifying workers on the CDC project, and an independent worker agreement," which J.G. advised workers were required to sign and to agree they were

53

"independent workers" not employees. A CDC spreadsheet for the week of September 17, 2012, depicted thirty-five paid employees, with the first eight listed as "W2.REAL" and the remaining listed as "W2.F.2CHK."[15]   Additional payroll spreadsheets and documents retrieved from the dumpster and provided by J.G. were for other projects. [Id. ¶¶ 13-15].  A spreadsheet for the weeks of March 2 and 10, 2013, for work at a hospital located at Fort Benning, provided the rate of pay and hours worked for fifty employees with two columns, Check 1 and Check 2, with the amount in column two equal to the deductions from an employee's pay.  A January 27, 2013, spreadsheet for that project listed twenty-one employees; however, an US DOL Certified Payroll Form submitted by IWES for the week of February 17, 2013, only lists the first eight employees on the January spreadsheet.  [Id. ¶ 15].  J.G. also provided an email from CS of Principle Partners Inc. to SS at IWES dated February 15, 2013, relating to sending checks directly to the job site, and a FedEx label for February 20, 2013,

---

[15]Affiant later in the Affidavit provided information concerning a comparison of this payroll spreadsheet with IWES' required filing with the Georgia DOL for that quarter of 2012 showing only twelve employees.  As noted, the spreadsheet showed thirty-five workers with the first eight being listed as receiving "W2.REAL" - those eight employees are listed on the Georgia DOL filing, but the remaining twenty-seven, listed as receiving "W2.F.2CHK," are not listed on the DOL filing.  [Id. ¶ 33]. Included on the list of twelve employees submitted to Georgia DOL is the name "Cesar Arbelaez."  [Id.].

54

showing a shipment to that location.  [Id. ¶ 16].  And J.G. provided four sets of pay stubs, two pay stubs per set, for former IWES employees working the CDC project - the first pay stub showing weekly earnings minus deductions and the second pay stub being the exact amount of the withholding for the first pay stub.  [Id. ¶ 17].

Affiant then recounted interviews with four former IWES employees who worked on the CDC project.  Some of the former employees also provided their pay stubs for work on the project.  [Id. ¶¶ 18-29].  Each individual advised that they received (and documentation confirmed) two checks for each work week, the first showing earnings with deductions and the second in the amount of the deductions.  Although they asked IWES office personnel for tax documents, none of the former employees received tax forms, either a W-2 or 1099.  [Id.].  One former employee stated that he visited the IWES office on February 15, 2013, and described the office as "an active office with file cabinets, computers, and other employees working in the office."  [Id. ¶¶ 28, 36].  Affiant compared the Certified Payrolls submitted by IWES to the government which indicated that employees had deductions taken from their pay; however, Affiant stated those amounts were paid back in a separate check to the workers.  [Id. ¶¶ 30-32].

In addition to the observations of the former employee concerning his visit to the IWES office, as noted, in March 2013, J.G. provided documents from the dumpster relating to payroll activities with dates from September 2012 to March 2013 and pertaining to multiple government contracts. Also, the last Georgia State Quarterly Tax and Wage Report for 2012, due by January 31, 2013, depicted IWES' address on Brook Hollow Parkway in Norcross. Affiant concluded that "[i]t appears that IWes conducts most, if not all of its administrative functions from its IWes Offices in Norcross." [Id. ¶¶ 35-39].

Affiant then addressed evidence stored in computers. "Based upon [his] knowledge, training and experience, and consultation with other law enforcement personnel, [he] know[s] that individuals and businesses engaged in an income producing business keep records of their financial activities. The records may be in the form of written notes, correspondence, receipts, negotiated instruments, bank statements and other records. Records may be paper based or stored on a computer or other electronic media." [Id. ¶ 41]. Affiant provided the reasons for seizing and searching computers and other electronic devices off-site if necessary. [Id. ¶¶ 42-43].

The search warrant was apparently executed on April 11, 2013, with an inventory of seized items provided. [Doc. 28-3 ("Inventory")]. With respect to

Defendants' challenge to the search warrant, they contend that seizure of Control #47, "Tax Info (Caesar)," and Control #59, "Tax info 2012 and 2011," exceed the scope of the search warrant. [Doc. 28 at 11]. And, contending lack of probable cause to search computers and related electronic devices, Defendants contend that Control #65, "Intuit CD," and Control #70-#91, various electronic devices and/or images thereof, should be suppressed. [Id. at 9-11].

## II.     Discussion

### a.     Franks

Defendants first contend that Affiant falsely made numerous misstatements of law concerning the legal obligations of companies performing construction work on government projects citing to paragraph 7 of the Affidavit and to other references to the same statement of law in paragraphs 4(a) and 37. [Doc. 28 at 4-5]. In paragraph 7, Affiant states:

> [T]he investigation was initiated approximately four months ago based on information provided by J.G., and four additional witnesses who are former employees of IWes that worked on the CDC project who provided documentation and statements to support the allegation that IWes submitted false information on Certified Payroll forms required by the Davis Bacon Act, 40 U.S.C. 276a (DBA), to conceal their willful failure to deduct payroll taxes as required by the Internal Revenue Code, 26 USC 7201, in violation of 18 U.S.C. § 1001.  In failing to withhold payroll taxes and report wages paid to employees, IWes caused false information

> to be reported to the [SSA] as to whether wages were paid for
> employment for employees working on the CDC project in violation of
> 42 U.S.C. Section 408(a)(1)(A).

[Affidavit ¶ 7]. Defendants' arguments [Doc. 28 at 5-7] that this statement of law is

incorrect are similar to those offered in support of the motion to dismiss the indictment

which the undersigned recommends rejecting *supra*, see Motion to Dismiss Counts 2

Through 12 of the Indictment. Defendants also challenge the statement in the

Affidavit that information and documents supplied by J.G. to the Government were

obtained from the dumpster located on the site of IWES offices. Defendants state that

"there is reason to question [J.G.'s] representation that the documents came from the

dumpster" based on the declaration provided by Arsecio Carmona that "all IWES

office personnel were instructed to follow IWES' company policy not to discard

unwanted documents but to shred them." [Id. at 7-8, citing Exh. 4 ("Declaration

('Dec.') Carmona")].[16] Defendants contend if these misstatements are stricken from

the Affidavit the remaining contents will not establish probable cause. The

---

[16]Defendants also contend that the Carmona declaration supports a finding that
the documents were actually stolen from the IWES' offices by individuals operating
at the behest of union representatives and, due to the "history" of cooperation between
union representatives and government authorities in prior investigations, that conduct
should be charged to the Government. On this basis, apparently in addition to a Franks
hearing, Defendants requested another hearing. [Doc. 28 at 7-9, 11-13].

Government responds that Franks does not apply to alleged misstatements of law and that Defendants pointed to no misstatements of fact made by Affiant in the Affidavit. [Doc. 40 at 3-4].

In Franks, 98 S. Ct. 2674, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  Franks, 98 S. Ct. at 2684-85; see also United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009).  "[T]o prevail in a Franks challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant."  O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (citation omitted).

And Franks is applicable to information omitted from an affidavit for a search warrant.  "[A] warrant affidavit violates the Fourth Amendment when it contains

59

omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (citation omitted).  "A party need not show by direct evidence that the affiant makes an omission recklessly.  Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.'" <u>Id.</u> at 1327 (citation omitted); <u>accord</u> <u>United States v. Owden</u>, 345 Fed. Appx. 448, 454 (11th Cir. 2009) (same).  "Omissions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . .   Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."  <u>Madiwale</u>, 117 F.3d at 1327; <u>accord</u> <u>United States v.</u> <u>Kapordelis</u>, 569 F.3d 1291, 1309 (11th Cir. 2009) ("The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'") (citation omitted).  No <u>Franks</u> hearing is required, if, when the omitted information is added to the affidavit, the affidavit's content still establishes probable cause for the search.  <u>Kapordelis</u>, 569 F.3d at 1309; <u>Owden</u>, 345 Fed. Appx. at 454 (if the challenge is based on information omitted from the affidavit, then the

60

showing must be that the "'omission was essential to the finding of probable cause'")

(quoting <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1294 (11th Cir. 2006)).

Accordingly, to mandate a <u>Franks</u> evidentiary hearing,

the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

<u>Franks</u>, 98 S. Ct. at 2684-85. The court, when applying this standard to Defendants' request for a <u>Franks</u> hearing, finds that Defendants have not made a substantial preliminary showing that material factual misrepresentations were intentionally and/or recklessly included in the Affidavit or that material factual information was intentionally and/or recklessly omitted from the Affidavit.

The court agrees with the Government that <u>Franks</u> addresses material factual misrepresentations not legal conclusions contained in an affidavit.  This issue was addressed by the district court in <u>United States v. Barnes</u>, 126 F. Supp. 3d 735 (E.D. La. 2015), which held that "<u>Franks</u> does not apply to the alleged misstatement of law in this case . . . ."  <u>Id.</u> at 740.  As was true in <u>Barnes</u>, Defendants do not cite to any legal authority to the contrary, and the court has not found any other decision ruling on this issue.  <u>Id.</u> at 740-41 & n.21.  As the district court in <u>Barnes</u> stated, "That no other court has applied <u>Franks</u> to misstatements of law is a strong reason for declining to do so in this case."  <u>Id.</u> at 741.  The court also agrees with the district court's conclusion that <u>Franks</u> should not be extended to misstatements of law because affiants to search warrants, as is the case herein, are non-lawyers, untrained in the law, and not expected to be versed, in this case, in the criminal statutes that might be violated based on nuances of the federal employment and tax laws.  "In this situation, the [agent's] sole responsibility is to attest to *facts* within his . . . personal knowledge."  <u>Id.</u> at 741 (emphasis added).  And, "[t]he determination of whether those facts support a finding of probable cause is committed exclusively to the magistrate judge, who is 'presumed to know the law and to apply it in making [her] decision.' . . . Thus, it would be both unreasonable and unnecessary to expect [agents] to educate magistrate judges on the

law applicable to a probable cause determination." <u>Id.</u> (citation omitted). Furthermore, in this case, as in <u>Barnes</u>, <u>Id.</u> at 741-42, Defendants failed to offer any proof that Affiant was aware that the identified paragraphs contained an incorrect statement of law as required by <u>Franks</u> - in fact, Defendants do not even allege that Affiant knew or should have known that the statements of law were incorrect.[17] [Doc. 28 at 4-6]. For these reasons, Defendants' arguments that they are entitled to a <u>Franks</u> hearing based on alleged misstatements of law in the Affidavit should be denied.

Defendants fair no better with their remaining argument in support of a <u>Franks</u> hearing. Relying on the declaration of Arcesio Carmona, Defendants contend that the statement in the Affidavit that the documents produced by J.G. were obtained from a dumpster is false. J.G. is not the affiant for the Affidavit but a source of information as to how the documents discussed in the Affidavit were obtained, and Affiant included the information in the Affidavit. [Affidavit ¶¶ 7, 13-17]. Mr. Carmona, the Human Resources Director for IWES during the time the documents were retrieved from the dumpster, provided background on office operations and the types of records maintained in IWES' offices. [Carmona Dec. ¶¶ 1-6]. According to Mr. Carmona, all

---

[17]The court also notes that the fact the grand jury returned a true bill of indictment based on the conduct set forth in the Affidavit would undermine any argument that Affiant's statement of law was made knowingly or even recklessly.

employees were directed to shred any unwanted documents and were told that no documents were to be taken out of the offices. Two shredders were provided for this purpose. [Id. ¶¶ 7-8].

Initially, the court finds that Defendants may not base their Franks' challenge on any alleged false information provided, even if found to be intentionally false, by J.G. And that conclusion holds true whether or not J.G. or other union representatives were paid government informants at the time the information about the source of the documents was relayed to Affiant. In United States v. Smith, 918 F.2d 1501 (11th Cir. 1990), the Eleventh Circuit Court of Appeals held that the trial court, relying on the "limiting language in Franks itself, '[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any non-governmental informant[,]'" properly rejected a defendant's request to examine the confidential informant as to the reliability of her statements which were included in the affidavit for the search warrant. Id. at 1508. The appellate court held that the confidential informant "was not an agent or instrumentality of the government within the meaning of Franks" and that the defendant's "contention would open up to Franks hearings the whole world of the compensated, non-official civilian informant" when the "decision nowhere implies that compensated civilian informants are to be open to

64

examination by titling them government agents . . . ."  Id.; and see United States v. Long, 774 F.3d 653, 661 (10th Cir. 2014) ("It is not the veracity of the informant that is at issue, but only the veracity of the affiant."); United States v. Wuagneux, 683 F.2d 1343, 1356 (11th Cir. 1982) (declining the defendant's request for disclosure of informants' identities which were being sought to undermine veracity of hearsay information they provided to search warrant affiant because such "a showing would not have aided the Franks claim[;]. . . an attack on the veracity of a non-governmental informant is not grounds for relief under Franks").  And Defendants have failed to articulate a basis for calling into question Affiant's reasonable reliance on the information provided by J.G. or to establish that he was at least reckless to include that information in the Affidavit.  See United States v. Rivera, 524 Fed. Appx. 821, 826 (3rd Cir. 2013) (rejecting the defendant's unsubstantiated contentions in seeking Franks hearing that the affiant should have questioned the veracity of the informant's information because the defendant "offered no evidence that the detective who provided the affidavit either knew that the information [from the informant] was not true or recklessly disregarded it's falsity"); United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000) ("'[T]he fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a Franks violation.  A Franks

65

violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth.'") (citation omitted).  Defendants are not entitled to a Franks hearing to develop whether there was a relationship between the Government and J.G. or any other union representative because that fact, if established, is irrelevant and would not provide a basis for granting Defendants a hearing.[18]

The proof offered by Defendants, Mr. Carmona's declaration, is woefully insufficient to establish that J.G. lied to Affiant much less that Affiant acted recklessly when including the information in the Affidavit.  The declaration does not establish that all IWES employees for the entirety of the relevant time frame, Spring 2012 through March 2013, actually complied with the policy to shred all unnecessary documents or that no documents were either intentionally or negligently discarded

---

[18]In all other respects, the sufficiency of the Affidavit for the Search Warrant is judged solely based on the information provided by Affiant to the issuing Magistrate Judge.  See United States v. Schulz, 486 Fed. Appx. 838, 841 (11th Cir. 2012) ("When deciding whether a search warrant was supported by probable cause, [the court] must consider only that information brought to the attention of the issuing judge."); United States v. Taylor, 2015 WL 5923580, at *1 (S.D. Ala. October 12, 2015) (if a defendant fails to make a showing to entitle him to a Franks hearing, then he is not entitled to a hearing for the submission of evidence for a reviewing court to reweigh probable cause for the warrant); United States v. Evans, 2006 WL 2221629, at *16 (M.D. Fla. August 2, 2006) (declining to hold an evidentiary hearing for reviewing court to hear evidence, not included in affidavit, as to whether issuing judge made proper legal determinations in authorizing search warrant).

66

ending up in the dumpster. In fact, total compliance by all employees would seem in the court's experience an unreasonable conclusion. And Mr. Carmona's declaration does not support a "reasonable conclusion" that instead of obtaining the documents from the dumpster, that "one of [J.G.'s] operatives stole the documents [from the office], was a [union] agent who worked in the IWES office and stole the documents, &/or was induced by IWES employee to illegally turn over IWES' materials." [Doc. 28 at 8-9]. The declaration does not undermine J.G.'s statement to Affiant as to the source of the documents much less constitute sufficient evidence to conclude that Affiant knowingly or recklessly included the information provided by J.G. in the Affidavit. Defendants have not alleged that either J.G. or Affiant made statements that conflict with the retrieval of the documents from the dumpster or that otherwise would reflect either a knowing or intentional misrepresentation with respect to how the documents were obtained. See United States v. Flowers, 531 Fed. Appx. 975, 981 (11th Cir. 2013) ("Franks requires the defendant to offer proof that the affiant had the requisite intent[;]" noting that Franks offered as examples of supporting proof, including, "'affidavits or sworn or otherwise reliable statements of witnesses,' apart from the warrant affidavit") (quoting Franks, 98 S. Ct. at 2684); Arbolaez, 450 F.3d at 1294 ("There is no affidavit or otherwise sworn statement alleging that [affiant]

67

knowingly or recklessly included false statements in the search warrant affidavit. Accordingly, we find that Arbolaez has failed to make the necessary 'substantial preliminary showing' and that there is no error."); United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1375 (N.D. Ga. 2001) (no Franks hearing when the defendants failed to offer proof that the affiant had some basis for knowing statement was false).

Defendants have not made a substantial preliminary showing that would entitle them to a Franks hearing.

### b.    Probable Cause - Computers and Other Electronic Devices

Defendants next contend that the Affidavit for the Search Warrant does not establish probable cause for the seizure and search of the various computers and other electronic devices found in the IWES offices.  [Doc. 28 at 9-11].  Defendants argue that Affiant's "bald assertions" based on his and other agents' training and experience that "evidence of business records are stored on 'COMPUTERS'" is insufficient to establish probable cause and further argue that, although various IWES documents are discussed in the Affidavit, Affiant did not identify any as being computer generated. [Id.].   The Government responds that the information contained in the Affidavit, including the description of the type of IWES documents seized, supplies probable cause to seize and search the computers and other electronic devices.  [Doc. 40 at 6-7].

68

The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the search warrant, the undersigned must determine only that Magistrate Judge Brill

69

had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam). The validity of the warrant is considered based on the totality of the circumstances. See Brundidge, 170 F.3d at 1352.

In the Affidavit, Affiant provided information about his training and experience in handling investigations involving fraud and crimes against the Government. [Affidavit ¶ 1]. Affiant also stated that he was relying in part on information provided by other law enforcement agents. [Id. ¶ 3]. Based on that background, Affiant stated, "I know that individuals and businesses engaged in an income producing business keep records of their financial activities. The records may be in the form of written notes, correspondence, receipts, negotiated instruments, bank statements and other records. Records may be paper based or stored on a computer or other electronic media." [Id. ¶ 41]. Although Defendants discount the opinion of Affiant, it is well-settled that a magistrate judge may rely on the opinion of experienced law enforcement officers in making a probable cause determination. See, e.g., United States v. Leach, 498 Fed. Appx. 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation."); United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of

70

experienced agents regarding facts are properly considered in determining probable cause); United States v. Magluta, 44 F.3d 1530, 1535 (11ᵗʰ Cir. 1995) (same); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11ᵗʰ Cir. 1983) (same).  And other information in the Affidavit supports Affiant's opinion. A witness described observing a fully-functioning IWES office, with office equipment that included computers, in February 2013.  [Id. ¶ 36].  Affiant provided information about office operations that supported his conclusion that "IWes conducts most, if not all of [IWES] administrative functions from" that office.   [Id. ¶¶ 35-39].   A magistrate judge may rely in determining probable cause not only the opinion of experienced agents but on reasonable inferences drawn from the facts in the affidavit about where evidence of a crime may be located.  See United States v. Alexander, 574 F.3d 484, 490 (8ᵗʰ Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7ᵗʰ Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted). Magistrate Judge Brill could have reasonably concluded that the evidence sought

71

concerning IWES business operations would probably be found in computers and other electronic devices located in the business office.

Significantly, the type of documents retrieved from the dumpster reinforces the conclusion that Defendants utilized computers in furtherance of the alleged crimes. As described in the Affidavit, those documents included numerous payroll spreadsheets listing information in several columns for a number of employees and for several government projects. And the retrieved documents included an email to IWES. [Affidavit ¶¶ 13-17]. Other employees provided copies of payroll stubs they received from IWES. [Id. ¶¶ 18-29]. IWES was also required to submit various forms to state and federal authorities detailing payroll and tax withholding information for employees. [Id. ¶¶ 9, 30-33]. A reasonable inference based on the description of these documents would be that most, if not all, were computer generated. Defendants' contention that Affiant's failure to explicitly state that these documents were computer generated is fatal to a finding of probable cause is not persuasive. In United States v. Khanani, 502 F.3d 1281 (11th Cir. 2007), the Eleventh Circuit Court of Appeals rejected a similar argument. In that case, the affidavit described the type of documents that had been seized from the trash but did not include that the forms were computer generated. The court stated, "While the Master Affidavit did not indicate that [the

72

document retrieved from the trash] was computer-generated tax form, in reviewing the affidavit to ascertain whether it furnished probable cause for the warrant sought, the affidavit is given a 'common sense and realistic' interpretation." Id. at 1290. Considering the type of documents seized, along with the fact that a witness observed computers in the office, the court found that the allegations in the affidavit "were sufficient to provide probable cause for the seizure of computers from [the] business." Id. Likewise, in this case, the totality of the information in the Affidavit establishes that Magistrate Judge Brill had a "substantial basis" for concluding that probable cause existed to uphold the warrant with respect to the seizure and search of the computers and other electronic devices. See Gates, 103 S. Ct. at 2331.

    **c.    Execution of Search Warrant**

    Finally, Defendants contend that "agents seized items that were clearly outside the scope of the warrant's authorization. See Exhibit 3, Inventory - Control #47 [Tax info (Caesar)]; and # 59 (Tax info 2012 & 2011). These items should also be suppressed." [Doc. 28 at 11].[19] Defendants offer no description of the content of these items nor explanation as to why they contend the items fall outside the scope of the

---

    [19]Defendants make two other references to exceeding the scope of the warrant's authorization but add nothing of substance to their argument. [Id. at 1, 3].

73

search warrant. [Id.]. The Government responds that the search warrant did authorize the seizure of these items citing to the attachment to the warrant. [Doc. 40 at 7]. The court finds that Defendants' conclusory claim is due to be denied.

> The Eleventh Circuit Court of Appeals has stated that:
>
> If a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional. However, a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally "not limited by the possibility that separate acts of entry or opening may be required to complete the search."

United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (quoting United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992)). "The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (quoting Wuagneux, 683 F.2d at 1352). This includes consideration of whether the agents executing the warrant reasonably interpreted the list of property to be seized to include items that may not be specifically listed in the warrant. See United States v. Hill, 19 F.3d 984, 987 (5th Cir. 1994) ("In identifying the property to be seized, the agents are 'required to interpret the warrant,' but are 'not obliged to interpret it narrowly.'") (citation omitted).

Seizure of items beyond the scope of the warrant does not automatically invalidate the search.  In <u>Khanani</u>, 502 F.3d 1281, the Eleventh Circuit Court of Appeals summarized the Court's prior holdings:

> Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct "exceeded any reasonable interpretation of the warrant's provisions." . . . "[A]bsent a 'flagrant disregard' of the terms of a warrant, the seizure of items outside the scope of the warrant will not affect admissibility of items properly seized," . . . or "constitute reversible error on direct appeal from the conviction."

<u>Id.</u> at 1289 (quoting <u>Wuagneux</u>, 683 F.2d at 1354; <u>United States v. Lambert</u>, 887 F.2d 1568, 1572 (11th Cir. 1989)); <u>see also</u> <u>Schandl</u>, 947 F.2d at 465.

The search warrant in this case authorized the seizure of the following items:

2.   All IRS forms, tax returns, attachments, work papers and related supporting documents for the years 2011 through the present of IWes Contracts and IWes Drywall.

3.   All correspondence relating to the preparation of tax returns for 2011 through the present, including correspondence with the IRS relating to tax returns and tax inquiries for IWes.

. . . .

6.   Employee files, including pay stubs, time and payroll records, Form W-4 Employee Withholding Certificates . . . .

10.    All correspondence between and amongst IWes and its employees, including email correspondence, regarding payroll, federal employment taxes . . . .

[Search Warrant, Attachment B].  The items challenged by Defendants as being outside the scope of the Search Warrant are "Tax info (Caesar)" and "Tax info 2012 & 2011." [Doc. 28 at 11].  Items number 2 and 3 listed *supra* appear to clearly cover seizure of the tax information for 2012 and 2011.  Defendants offer no explanation to support another conclusion.  And, for the tax information apparently for "Caesar," seizure of this information is arguably covered by items numbered 6 and 10, if not by items numbered 2 and 3.  Although the name is not spelled the same, the Affidavit for the search warrant, based on paperwork prepared by IWES, identifies "Cesar Arbelaez" as an IWES employee.  [Affidavit ¶ 33].  And, even if not the same employee, it would be reasonable for agents executing the warrant to believe that any tax information found in the offices would fall within the scope of the warrant and be pertinent to the offenses for which the warrant was issued.  See Hill, 19 F.3d at 987.  Again, Defendants offer nothing to substantiate their contention that this item falls outside the scope of the warrant.

Defendants' failure to "specifically detail[ ] how the warrant's scope was exceeded in execution" results in a finding that they are not entitled to "the relief of

76

suppression." <u>United States v. Lisbon</u>, 835 F. Supp. 2d 1329, 1347 (N.D. Ga. 2011); <u>and see</u> <u>United States v. Phothisat</u>, 2014 WL 4979196, at *4 (S.D. Ala. October 6, 2014) ("To the extent Defendant claims the search exceeded the scope of the warrant, his motions lacks sufficient detail" because "[h]e has failed to identify any specific item seized that was beyond the scope of the warrant."); <u>United States v. Arzate</u>, 2014 WL 1256075, at *9 n.2 (N.D. Ga. March 26, 2014) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that a substantial claim is presented. . . . The Court need not act upon general or conclusory assertions."). Defendants have not carried their burden to establish a flagrant disregard of the warrant's terms such to require suppression of any of the evidence seized during the search.

### d.    Good Faith

Defendants contend that the Government cannot rely on the good faith exception because of the allegedly misleading information, identified *supra*, that was included in the Affidavit. [Doc. 11]. However, as the court concluded, the Affidavit does not contain or omit either intentionally or recklessly made material factual misstatements or omissions; therefore, the good faith exception is applicable and the evidence seized should not be suppressed. In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and

77

Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies.  Id. at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"  Id. at 1480 (quoting Leon, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  Id. at 1481.

The Search Warrant for IWES was not "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable[.]'" Leon, 104 S. Ct. at 3421 (citation omitted). The court notes that the Affidavit supporting the Search Warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine. See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998). The Affidavit included details about the alleged offenses, interviews with witnesses and former employees and analysis of documents provided to the Affiant. The Affidavit provided factual details for the Magistrate Judge to consider and evaluate. The law enforcement officers were, therefore, entitled to rely upon her evaluation and determination that "given all the circumstances set forth in the affidavit before [her], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 103 S. Ct. at 2332.

Additionally, even if the Search Warrant allows for the seizure of some items for which probable cause was not established in the Affidavit, in the Eleventh Circuit, the good faith exception to the exclusionary rule is applicable "'to a search conducted pursuant to an overly broad warrant.'" United States v. Haynes, 160 Fed. Appx. 940, 944 (11th Cir. 2005) (quoting United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000)). In Travers, the Eleventh Circuit Court of Appeals, citing Accardo, affirmed

that the good faith exception may be applied to an overly broad warrant.  233 F.3d at 1330 (citing Accardo, 749 F.2d at 1481).  However, the court stated that the exception is not applicable "if the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid."  Id. (citing Accardo, 749 F.2d at 1481) ("The question here is not the legal validity of the warrant but the reasonableness of the officers' reliance on it.  This is not an instance in which 'it is plainly evident that a magistrate or judge had no business issuing a warrant.'") (quoting Sheppard, 104 S. Ct. at 3429 n.7).  As discussed, information provided in the Affidavit provided a basis for seizing and searching the computers and other electronic devices for the items authorized by the Search Warrant.  Executing agents reasonably relied on the Magistrate Judge's issuance of the warrant.

The good faith exception applies to the Search Warrant in this case.

## III.    Search of Dumpster

As noted in the Affidavit for the Search Warrant for the IWES offices, representatives of the Southeastern Carpenters Regional Council ("SCRC") conducted searches of a dumpster on the premises of the office complex where the offices for IWES was located from Spring 2012 through early 2013.  Documents apparently discarded by IWES, found in the dumpster, were turned over to investigating agents.

80

[Affidavit ¶¶ 13-17, 35-39].  Defendants argue that the SCRC members involved in ordering and conducting the dumpster searches were acting as agents for the Government at the time the searches were conducted and that the seizures of documents from the dumpster violated their Fourth Amendment rights.  The Government, however, argues that before addressing the issue of agency, Defendants must first establish a legitimate expectation of privacy in the dumpster.  An evidentiary hearing was held on April 5, 2016, at which, after considering the arguments of the parties, the court found that Defendants had failed to establish a legitimate expectation of privacy and could not, therefore, challenge the seizure of the documents from the dumpster.  [Doc. 67].[20]

## I.    Background Facts

Beginning sometime in the Spring of 2012, Calvin Garrett, a SCRC Council Representative, was directed by John Gibbs, another Council Representative, to conduct, if possible, dumpster searches at the location of the IWES offices.  (Tr. at 56, 62, 64, 67).  After verifying the address, 5151 Brook Hollow Parkway, for IWES, Mr. Garrett made an initial daytime visit to the property to determine whether the dumpster was publically accessible.  (Tr. at 64-65, 68-69).  Mr. Garrett was checking to see if

---

[20]Citations to the evidentiary hearing transcript are:  (Tr. at ).

81

the dumpster was secured behind fencing or was locked.  (Tr. at 64-65).  Although

there was some fencing around part of the office complex and parking lot, as he drove

onto and around the parking lot, he did not observe any signs near the dumpster and

no fencing around the dumpster, and the dumpster was not locked.[21]  (Tr. at 70-71, 74-

75, 80-81).  The dumpster was utilized by all of the office complex tenants, numbering

approximately eight to ten businesses, for both buildings.  (Tr. at 37-38, 53-54, 84).

In the "V" between the two buildings, located at ground level, there is a "NO

TRESPASSING" sign at the access point to the buildings.  (Tr. at 18-20, 49; Def.

Exhs. 8, 10).[22]  The "sign is when you get into the buildings, between both buildings

. . ." and is not near the dumpster.  (Tr. at 52-53).  No evidence was offered that either

Defendant personally placed or had someone place any of the fencing around the

property or placed - or even requested - the no trespassing sign or took any other steps

---

[21]Photographs introduced of the office complex in which IWES is a tenant indicate that the complex is comprised of two buildings situated in a "V" with the IWES offices marked with those initials on the ariel view photograph.  (Tr. at 9-10, 48; Def. Exh. 1).  Although there is fencing around two and one-half sides of the parking area for the complex, two open driveways provide unrestricted entrances onto the parking lot and up to the dumpster, to which access is not restricted.  (Tr. at 10-17, 30-35, 49-51; Def. Exhs. 1-1, 9; Gov't Exhs. 3-5).  The dumpster is marked with an "X" on the photograph of the ariel view of the complex.  (Tr. at 71-72; Def. Exh. 1).

[22]The location of the sign is marked with a dark round dot on the photograph of the ariel view of the complex.  (Tr. at 19; Def. Exh. 1).

to restrict access to the office complex or to the dumpster.  No evidence was offered to establish that either Defendant had the authority to restrict access to any part of the office complex besides the IWES offices.

When Mr. Garrett actually conducted the dumpster searches, he would arrive between 5:30 a.m. and 6:00 a.m., entering by way of one of the driveways and driving up to and parking next to the dumpster.  (Tr. at 77, 79-80).  He would then use a pincher stick to grab as many bags out the dumpster as possible and place the bags of trash into the back of his truck.  (Tr. at 80).  Once he arrived back at the SCRC office, he would open each bag of trash, discarding the trash from other tenants and keeping any items associated with IWES.  (Tr. at 83).

Additional facts will be set forth as necessary during discussion of the issue before the court.

## II.    Discussion

Based on the facts established at the evidentiary hearing, the court found that Defendants lacked a reasonable expectation of privacy in the dumpster and could not challenge the warrantless search of the dumpster whether or not conducted by agents for the government.  (Tr. at 96-97).  The court recommends, to the extent Defendants' motion [Doc. 28] to suppress includes a challenge to reliance on information seized

83

from the dumpster to establish probable cause for the Search Warrant, that Defendants'

motion be **DENIED**.

A determination of whether the searches violated the Fourth Amendment

depends on whether Defendants had a reasonable expectation of privacy in the trash

and the dumpster at the times of the searches. See California v. Greenwood, 108 S. Ct.

1625, 1628 (1988) ("The warrantless search and seizure of the garbage bags left at the

curb outside the Greenwood house would violate the Fourth Amendment only if [the

defendants] manifested a subjective expectation of privacy in their garbage that society

accepts as objectively reasonable.").   To determine whether an individual may

challenge a search, the court must decide "whether the individual maintains a

legitimate expectation of privacy in the object of the search."   United States v.

Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendants Tabares' and

Bazantes' burden to prove that they had a legitimate expectation of privacy in the

object of the search, the dumpster, from the Spring of 2012 through early 2013. See

United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this

determination involves a two-part inquiry: (1) "whether the individual has manifested

'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and

(2)] whether society is willing to recognize the individual's expectation of privacy as

84

legitimate." <u>Hastamorir</u>, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" <u>United States v. Brown</u>, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting <u>Rakas v. Illinois</u>, 99 S. Ct. 421, 425 (1978)).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" <u>United States v. Chaves</u>, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1549 (11th Cir. 1995).

In <u>Greenwood</u>, involving the seizure of trash located outside a residence, the Supreme Court held that, although the defendants evidenced a subjective expectation of privacy by placing the garbage in opaque bags, they "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection." 108 S. Ct. at 1628.  The Court noted that respondents had placed the garbage at the curb, outside of the curtilage of their home, for the purpose of it being collected by a third party who could have examined the garbage or allowed others to do so.  "Accordingly, having

85

deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' . . . [the defendants] could have had no reasonable expectation of privacy in the inculpatory items they discarded." Id. 1629 (citation omitted).

The Court in Greenwood found that the trash was outside the residence's curtilage.  In United States v. Dunn, 107 S. Ct. 1134 (1987), the Supreme Court drew a distinction between a residential search and a search occurring on commercial premises which is not dependent on identifying a business' curtilage.  The court stated:

> For a homeowner to preserve Fourth Amendment protection in the area immediately surrounding the residence, he or she must not conduct an activity or leave an item in plain view of those outside that area.  The occupant of a commercial building must take the *additional* step of affirmatively barring the public from the area because a business operator has a reasonable expectation of privacy only in those areas from which the public has been excluded.

Id. at 1147 (emphasis in original); and see United States v. Hall, 47 F.3d 1091, 1095 (11th Cir. 1995) (same); United States v. Medina, 2015 WL 8770076, at *5 (S.D. Fla. December 15, 2015) (same).  Defendants and the Government both point the court to the Eleventh Circuit Court of Appeals' decision in Hall in order to make their arguments; however, the analysis in Hall only supports a finding that Defendants had no reasonable expectation in the dumpster or its contents.

86

In <u>Hall</u>, the commercial property at issue belonged to "a closely held Miami-based seller of space aviation parts and supplies" for which the defendant was the chairman. <u>Id.</u> at 1092. In order to conduct the dumpster search, the agent entered the property and traveled forty yards on a private paved road to reach the dumpster located in a parking area reserved for employees.[23] <u>Id.</u> The court found that the "dumpster was readily accessible to the public." <u>Id.</u> The court noted that the lower court had found that, although the road was private, "no 'objective signs of restricted access such as signs, barricades, and the like' were present." <u>Id.</u> at 1096 (no citation provided). The location of the dumpster on the defendant's property, when considered as a factor to establish an expectation of privacy, was undermined by the lack of any affirmative steps to exclude the public - a failure enhanced by the fact "the asserted expectation of privacy is in discarded garbage." <u>Id.</u> The court stated that a "commercial proprietor incurs a . . . diminished expectation of privacy when garbage is placed in a dumpster which is located in a parking lot that the business shares with other businesses, and no steps are taken to limit the public's access to the dumpster. It is common knowledge that commercial dumpsters have long been a source of fruitful exploration for scavengers." <u>Id.</u> For these reasons, the court rejected the defendant's claim to a

---

[23]And the agent testified that he was unaware that the road was private. <u>Id.</u>

legitimate expectation of privacy in the contents of the dumpster located on that business entity's premises.  Id. at 1097.

Defendants present not nearly as strong a case.  Defendants are not the owners of the commercial business complex and have presented no evidence  supporting any reasonable expectation of privacy outside of the IWES offices much less in garbage placed in the communal dumpster.  They are merely tenants along with eight to ten other business tenants, all of whom have access to and use the dumpster in question. (Tr. at 37-38, 53-54, 84).  Defendants presented no evidence that they have the right to exclude anyone from the dumpster.  The area where the dumpster is located, in the parking lot of the office complex, is readily accessible to the public; there are no barricades or fences or gates that restrict access to the two driveways providing entry onto the property.  Likewise, no fencing or locks prevent access to the dumpster which is open and easily accessible by anyone in the area.  (Tr. at 9-17, 30-35, 49-51, 70-72, 79-82; Def. Exhs. 1-7, 9; Gov't Exhs. 3-5).  Although there is a no trespassing sign on the property, the court finds that the sign, located at the entrance to the two office buildings, is intended to restrict access to the actual office buildings and not to the entire office complex, inclusive of the parking lot.  The sign is not at the entry to the parking lot for the office complex and is not near the dumpster and cannot be viewed

88

from the dumpster.  (Tr. at 18-20, 49, 52-53, 74-75; Def. Exhs. 8, 10).  The facts presented at the evidentiary hearing are devoid of any evidence that anyone, including Defendants, took any affirmative steps to exclude the public from the dumpster.  See Hall, 47 F.3d at 1096; and see United States v. Nwobi, 543 Fed. Appx. 706, 706 (9th Cir. 2013) (finding that district court, based on the lack of a legitimate expectation of privacy, properly denied the defendant's motion suppress evidence obtained from a commercial waste container "located in a shared parking lot of a business park" when the receptacle "was visible from the street, the gate surrounding the business park was open, and the commercial waste bin was not locked"); United States v. Dunkel, 900 F.2d 105, 106-07 (7th Cir. 1990) (finding that owner of office complex, housing several tenants, all who used the same dumpster located in the parking lot of the complex to which access was not restricted, lacked a reasonable expectation of privacy in the dumpster or in the documents seized from the dumpster), remanded and vacated on other grounds, 111 S. Ct. 747 (1991).

For these reasons, the court finds that Defendants lacked a reasonable expectation of privacy in the dumpster and in the documents seized from the dumpster. The Government's use of that information in the Affidavit for the Search Warrant did not violate Defendants' Fourth Amendment rights.

## IV.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motion [Doc. 28] to suppress evidence be **DENIED**.

### **Bill of Particulars**

Defendants also seek a bill of particulars "regarding Counts 2-6 of the . . . indictment" in order to properly prepare for trial and request that the court order the Government to "a.   State with particularity the basis for the failure to pay charge conspiracy; b. State with as much particularity as possible the amounts the government claims the Defendants failed to pay each quarter and the source document for determining that amount; c. State with as much particularity [as possible] the facts upon which [the Government] [r]elies to assert that the Defendants [were] required to account for and [pay over the tax under 26 U.S.C. § 7202." [Doc. 32 at 7].[24]   The Government opposes the bill of particulars noting that the allegations in the indictment and the discovery produced provide most of the information being sought by

---

[24]Defendants also contend that it is critical that they know the identities of un-indicted co-conspirators and aiders and abettors, but they do not subsequently include a request for information regarding the identities of such individuals.  [Id. at 4, 7].  As the Government usually provides this information without an order from the court, the court assumes that, if requested, the Government would do so - or has done so - in this case.

AO 72A
(Rev.8/82)

Defendants and that Defendants are simply seeking evidentiary detail which is not properly the subject of a bill of particulars. [Doc. 43].

"The purpose of a bill of particulars is to inform the defendant of the charge against him [or her] with sufficient precision to allow him [or her] to prepare his [or her] defense, to minimize surprise at trial, and to enable him [or her] to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" id. (quoting United States v. Crippen,

579 F.2d 340, 349 (5th Cir. 1978)). The counts in the indictment, which have been set out in detail *supra*, sufficiently allege each offense, state the elements of each offense charged therein and provide details regarding the manner and means by which Defendants engaged in the charged offenses. [Doc. 1]. Defendants have not demonstrated that the information requested in the bill of particulars is essential to preparation of their defense at trial.

In this case, Defendants are seeking evidentiary detail to which they are not entitled in a bill of particulars. See Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not designed to compel the government to detailed exposition of its evidence'") (citation omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law. It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as

92

opposed to helpful, in preparing a defense.").  The requests for the specific factual basis for the "failure to pay charge conspiracy" and for the tax counts sought in Defendants' motion exceed the scope of a bill of particulars, and based on the circumstances of this case, the information sought is not necessary "to inform [Defendants] of the charge[s] against [them] with sufficient precision to allow [them] to prepare [their] defense, to minimize surprise at trial, and to enable [them] to plead double jeopardy in the event of a later prosecution for the same offense[s]."  Warren, 772 F.2d at 837.  As noted by the Government, the averments and allegations in Count 1 explain the background for the charged offenses and the manner and means by which Defendants engaged in those offenses.  [Doc. 1; Doc. 43 at 3].  With respect to Defendants' request that the Government provide the amounts due and owing in Counts 2 through 6, and identify the documents supporting those amounts, the Government correctly points out that the amount due and owing is not an element of the charged tax offenses.  See Russell, 2013 WL 572085, at *1 (D. Neb. February 13, 2013) (three essential elements in § 7202 are: "(1) the defendant had a duty to collect, account for, or pay over the tax at issue; (2) the defendant knew of this duty; and (3) the defendant willfully failed to collect, account for, or pay over the tax").

93

Furthermore, Defendants seek the details about the acts in which *they* engaged in commission of the charged offenses.  It is doubtful that Defendants could establish that, without the Government providing the details about the evidence it intends to introduce at trial, they were not able to prepare a defense to the charged offenses or were surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'" United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).

For these reasons, the court **DENIES** Defendants' motion [Doc. 32] for a bill of particulars.

94

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motions [Docs. 27 and 29] to dismiss various counts of the indictment be **DENIED** and that Defendants' motion [Doc. 28] to suppress evidence be **DENIED**.

The court **ORDERS** that Defendant's motion [Doc. 31] for the production of evidence related to claims of selective prosecution and motion [Doc. 32] for a bill of particulars be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 3rd day of June, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

95

AO 72A
(Rev.8/82)